Roel GARCIA, Appellant,

v.

William Stuart ALLEN,
et al., Appellees.

No. 13–99–032–CV.

Court of Appeals of Texas,
Corpus Christi.

June 8, 2000.

Rehearing Overruled Oct. 12, 2000.

Jay M. Wright, Corpus Christi, for appellant.

M. Colleen McHugh, Bracewell & Patterson, Corpus Christi, J. Joe Harris, Bracewell & Patterson, San Antonio, for appellee.

Before Justices DORSEY, CHAVEZ, and RODRIGUEZ.

## OPINION

Opinion by Justice DORSEY.

Roel Garcia was hired to work as an analyzer technician by Hoechst Celanese Corporation in 1991. When he was hired, he was without a kneecap in his left knee. It had been removed as a result of a previous job-related injury he sustained in 1986 while working for a different employer. Hoechst Celanese knew at the time it hired Garcia that he did not have the kneecap.

In 1997, Garcia had another surgery on his knee. His doctor placed him on permanent restrictions that prohibited him from climbing, squatting, kneeling and crawling. Celanese terminated him after that surgery.[1] Garcia contends that he was terminated not because of his diminished ability to perform the essential functions of his job, but rather, he was terminated as a part of a vendetta propagated against him by his two supervisors. After his termination, Garcia brought suit against the corporation and the two supervisors (hereinafter collectively referred to as "Celanese") for disability discrimination, negligence, fraud, defamation, and workers' compensation retaliation.

The trial court granted summary judgment in favor of Celanese on all causes of action.[2] Garcia moved for new trial, in

---

1. Garcia's doctor modified Garcia's restrictions, and he was allowed to return to work in November of 1998.

2. The trial court granted two summary judgments in this case. The first disposed of the discrimination, negligence, fraud and defamation claims on December 18, 1998. Then, approximately one month later, the trial court granted summary judgment in favor of Celanese on Garcia's retaliation claim. The trial

part on the basis of newly discovered evidence. The trial court denied his motion for new trial, and Garcia timely perfected this appeal. He brings five points of error, challenging the trial court's grant of summary judgment on the negligence, defamation, discrimination and retaliation causes of action, and for its denial of his motion for new trial.

## I. NEGLIGENCE

First, Garcia argues the trial court erred in granting summary judgment against him on his common law negligence cause of action. We disagree.

Garcia contends that he was injured by Celanese as a result of the negligent conduct of its supervisors in "dishonestly reporting Garcia's job performance." The gist of his cause of action is that although he was able to adequately perform his job functions despite his knee injury, his supervisors falsely reported that he was unable to perform them. He contends that the corporation was thereby negligent in its supervision and hiring of its employees. He argues that Celanese owes a duty to its employees to hire and retain supervisors who will not cause harm or injury to its other employees. Also, he argues that the two supervisors owed him a duty to truthfully report his job performance and capability when the corporation requested them to make a report. Finally, he contends that the corporation had a duty to adequately investigate the supervisor's reports regarding his job performance or capability.

 We hold that the trial court was correct in granting summary judgment against Garcia on his common law negligence cause of action because Celanese did not owe to Garcia the duties he alleges. The existence of a duty is an essential element of a negligence cause of action. *See Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). Thus, the mere failure to exercise reasonable care

court entered a take-nothing judgment against

does not *ipso facto* give rise to a cause of action for negligence. *Cf. Praesel v. Johnson,* 967 S.W.2d 391, 394 (Tex.1998) (noting that the elements of a negligence cause of action are (1) a legal duty; (2) breach of that duty; and (3) damages proximately resulting from the breach). The nonexistence of a duty ends the inquiry into whether negligence liability may be imposed. *Van Horn v. Chambers,* 970 S.W.2d 542, 544 (Tex.1998). The existence of a duty is a threshold question of law. *Id.; St. John v. Pope,* 901 S.W.2d 420, 424 (Tex.1995); *Bird v. W.C.W.,* 868 S.W.2d 767, 769 (Tex.1994).

### A. Duty to Investigate Claims Regarding an At–Will Employee Prior To Termination

 We hold that an employer has no duty to investigate information about an at-will employee prior to terminating that employee. To impose upon employers a previously unrecognized duty runs the risk of abrogating the traditional at-will employment relationship, which is the norm in Texas. *Cf. City of Midland v. O'Bryant,* 18 S.W.3d 209, 216 (Tex. 2000). Absent a contract, the relationship between worker and employer is "at will," except for a few very narrow exceptions, with each party being able to end it at any time without reason or justification. *See Winters v. Houston Chronicle Pub. Co.,* 795 S.W.2d 723, 726 (Tex.1990); *East Line & R.R.R. Co. v. Scott,* 72 Tex. 70, 10 S.W. 99, 102 (1888); *see also Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733, 735 (Tex.1985) (recognizing a narrow exception for an employee discharged for the sole reason of refusing to perform an illegal act). The Texas Supreme Court has refused to impose a general duty of good faith and fair dealing upon employers under an at-will employment agreement, stating:

A court-created duty of good faith and fair dealing would completely alter the nature of the at-will employment rela-

Garcia on February 1, 1999.

tionship, which generally can be terminated by either party for any reason or no reason at all, and we accordingly decline to change the at-will nature of employment in Texas.

*City of Midland v. O'Bryant,* at 216.

■ This court has already held that an employer owes no duty to investigate allegations against an employee before terminating the employee. *Rios v. Texas Commerce Bancshares, Inc.,* 930 S.W.2d 809, 816 (Tex.App.—Corpus Christi 1996, writ denied); *see also Palmer v. Miller Brewing Co.,* 852 S.W.2d 57, 63 (Tex.App.—Fort Worth 1993, writ denied) (holding that employer has no duty to investigate reasons for chronic absences prior to terminating employee). An employer does not have to justify the reasons it terminated an employee under an at-will employment contract. We hold that Celanese had no duty to investigate Garcia's physical ability to perform his job functions prior to terminating his employment.

### B. Negligent Hiring, Supervision, and Retention

■ Next, Garcia urges that the well-established common law doctrine regarding negligent hiring and supervision of employees imposed a duty upon Celanese corporation to exercise reasonable care in supervising Garcia's supervisors so that they did not cause injury to Garcia. Under that doctrine,

an employer has a duty to adequately hire, train, and supervise employees. The negligent performance of those duties may impose liability on an employer if the complainant's injuries result from the employer's failure to take reasonable precautions to protect the complainant from the misconduct of its employees.

*Castillo v. Gared, Inc.,* 1 S.W.3d 781, 786 (Tex.App.—Hous. [1st Dist.] 1999, pet. denied) (*citing Mackey v. U.P. Enterprises, Inc.,* 935 S.W.2d 446, 459 (Tex.App.—Tyler 1996, no writ)); *accord Golden Spread Council, Inc. v. Akins,* 926 S.W.2d 287, 294

(Tex.1996); *Verinakis v. Medical Profiles, Inc.,* 987 S.W.2d 90, (Tex.App.—Houston [14th Dist.] 1998, pet. denied); *Houser v. Smith,* 968 S.W.2d 542, 544 (Tex.App.—Austin 1998, no pet.); *Robertson v. Church of God, Intern.,* 978 S.W.2d 120, 124 (Tex. App.—Tyler 1997, pet. denied); RESTATEMENT (SECOND) OF TORTS § 315.

At first blush, Garcia's claims do appear to be governed by this doctrine. However, we do not believe this is an appropriate application of the doctrine of negligent supervision. Garcia has cited us to no case where this doctrine was imported into a similar fact scenario. And we find that if we were to hold that the failure to adequately supervise management-level employees resulting in the termination of an employee without adequate investigation were actionable under this doctrine, we would be again abrogating the traditional at-will employment relationship. A contested firing can virtually always be recast as a "failure, on the part of the employer, to adequately supervise the personnel in charge of hiring and firing."

The rule regarding adequate supervision and hiring of employees typically has been applied in situations that either involve physical danger or where the alleged inadequate supervision caused harm to third persons rather than co-workers. *See Sibley v. Kaiser Found. Health Plan of Tex.,* 998 S.W.2d 399, 403–04 (Tex.App.—Texarkana 1999, no pet.) (holding that the doctrine extends only to prevent the employee or independent contractor from causing physical harm to a third party); *Verinakis,* 987 S.W.2d at 97–98 (duty under theory of negligent supervision only extends to prevent the employee or independent contractor from causing physical harm to a third party); *cf Hendrix v. Bexar County Hosp. Dist.,* No. 04–98–00833–CV, 2000 WL 36098 (Tex.App.—San Antonio December 30, 1999, no pet. hist.) (involving sexual assault upon patient by hospital employee); *Duran v. Furr's Supermarkets, Inc.,* 921 S.W.2d 778, 789–90 (Tex.App.—El Paso 1996, no writ) (involving assault and bat-

tery of a customer). Under that theory, Garcia's claim would fail because he has not alleged physical injury in this case.

The San Antonio court of appeals took a different tack in holding that an employer cannot be held liable for the negligent hiring, retaining, training, or supervising of its employee unless the employee committed an actionable tort. *See Gonzales v. Willis*, 995 S.W.2d 729, 739 (Tex.App.—San Antonio 1999, no pet.) (where employee made sexual advances on job applicant, but where employee's conduct did not rise to the level of intentional infliction of emotional distress, or any other recognized tort).[3] That court stated:

> This rule comports with the fundamental tort principle that a person is not liable for negligence, no matter how egregious, unless the negligence causes a legally compensable injury. *See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 30, at 165 (5th ed.1984). In the context of negligent hiring claims, if the employee did not commit an actionable tort, the plaintiff has not been injured in the eyes of the law; therefore, the employer's negligence has not caused a legally compensable injury.

We have already held that failing to investigate the ability of an employee to perform his job duties before terminating him is not an actionable tort. Thus, under the San Antonio court's rationale, Garcia's claim would also fail.

■ This court would be, effectively, creating a new common law tort which has until now been expressly rejected if we interpret the negligent supervision doctrine as encompassing a duty that employers supervise their employees in a manner

that prevents the "wrongful termination" of other employees. We hold that employers do not have a duty to supervise their employees in a manner that prevents other employees from being terminated without sufficient justification for the termination. Accordingly, no cause of action for negligence will lie in that scenario. To hold otherwise would encroach into the employer's absolute right to terminate an at-will employee.

We affirm the trial court's grant of summary judgment in favor of Celanese on Garcia's negligence cause of action.

## II. DEFAMATION CLAIMS

■ Next, Garcia claims the trial court erred in granting summary judgment in favor of defendants on his defamation claims. Specifically, Garcia alleges that his two supervisors, Garcia and Allen, made defamatory statements about him that he could not do his job with restrictions on his climbing, kneeling, and squatting, when they actually knew that to be false. Garcia alleges that he had identical job restrictions prior to the surgery, and that his supervisors were aware of this when they said he could no longer perform his job. Garcia also alleges that those statements were made with malice.

Defendants Allen and Garcia admit to making the statements, but counter that the statements were true.[4] Because we find that Celanese has conclusively established the affirmative defense of truth, we affirm the trial court's ruling.

■ Truth is a complete defense to defamation. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex.1995). Because it is an affirmative defense, the

---

3. In the absence of Texas law on the subject, the San Antonio court looked to the law of other jurisdictions, citing *Hays v. Patton–Tully Transp. Co.*, 844 F.Supp. 1221, 1223 (W.D.Tenn.1993); *Mulhern v. City of Scottsdale*, 165 Ariz. 395, 799 P.2d 15, 18 (1990); *Hogan v. Forsyth Country Club Co.*, 79 N.C.App. 483, 340 S.E.2d 116, 123–25 (1986); *Louis Marsch, Inc. v. Pekin Ins. Co.*, 140 Ill.

App.3d 1079, 96 Ill.Dec. 386, 491 N.E.2d 432, 437 (1985).

4. Celanese also argues that the statements were not defamatory and, at any rate, were covered by qualified privilege. Because we find the statements were true, we do not address these issues.

defendant bears the burden of establishing that the alleged defamatory statements were true. *Knox v. Taylor*, 992 S.W.2d 40, 54 (Tex.App.—Houston [14th Dist.] 1999, no pet.); *see* TEX.R. CIV. P. 166a(c); *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex.1999). A showing of substantial truth at a summary judgment hearing will defeat a defamation claim. *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex.1990). We hold that Celanese met its burden.

Celanese attached to its summary judgment motion the affidavits of Allen and Garcia, Roel Garcia's supervisors. Allen's affidavit stated:

> Roel Garcia went out on a medical leave of absence sometime in April 1997 and it is my understanding that he had knee surgery in May 1997. Sometime in June–July 1997, I became aware that Roel's doctor had placed permanent restrictions on him. He was not supposed to kneel, squat or climb. I was asked by Curtis Blackburn, Section Leader in Human Resources, whether I thought Roel, with these restrictions, could perform all of the essential job duties of a Process Analyzer Mechanic. I consulted with Hector Garcia and we discussed Roel's restrictions and the essential job requirements of the position. We were in agreement. In our opinion, Roel, with his restrictions, could not perform all of the essential job duties required of a Process Analyzer Mechanic. That was my honest opinion then, and it is still my honest opinion today. Essential job duties of the position require a person to squat, kneel and climb. I conveyed our opinion (mine and Hector's) to Curtis Blackburn.

Garcia's affidavit concurred.

Also attached as summary judgment evidence was a letter dated July 2, 1997, from Dr. William E. Swan Jr., who treated Roel Garcia. It stated:

> Mr. Garcia has been under my care for significant problems with his left knee. This patient has had a patellectomy of the left knee. He has had a medial meniscectomy and he has severe chondromalacia of the distal end of the femur secondary to the severe chondromalacia of the patella which had actually led to the patellectormy.

> At the present time this patient has severe pain and this pain in a knee without a patella precludes him from squatting or kneeling, from climbing and from squatting and crawling. This will be a permanent restriction.

> I anticipate that this young man will probably require a total knee replacement some time between the ages of 45 and 50. I am not in favor of performing a total knee replacement on someone as young as he is due to the fact that these knee replacements do not last forever.

> Again, at this point again (sic) I anticipate that these limitations are permanent. If you have any further question, feel free to contact me.

Celanese also provided summary judgment evidence stating that Roel Garcia's restrictions would prevent him from being able to do the job of an analyzer mechanic. Garcia did not controvert this evidence, but urges that with accommodations, he can perform his job.

Even Roel Garcia's own affidavit indicates that the statements made by his supervisors regarding his medical condition were true. He stated:

> In or about May 1986, I had a patellectomy (removal of kneecap) of the left knee. I began working with the company on July 15, 1991. I had not experienced any problems with my knee that prevented me from being functional in my job. I was able to perform some duties that involved climbing; however, I was unable to craw, kneel, or squat without difficulties. The group that I worked within implemented a general rule that paired two employees to an area. Any time a job called for a physical activity that I was unable to do, my partner performed the duty. This ar-

rangement worked out very well and I had not experienced any negative complaints from my fellow co-workers. My supervisor nor any other crew leader ever indicated that my restrictions was a problem. In April of 1997, the pain and discomfort in my knee had become unbearable. I informed the company nurse that I would need to seek medical assistance.... In May 1997, I had arthroscopic surgery on my left knee. I was told that I would need a total knee replacement; however, because of my age the doctor wanted to postpone the procedure. I recuperated for a short time and in June 1997 the doctor issued me a release back to work with restrictions not to climb, kneel, squat, or crawl. The company refused to allow me to work.... I have suggested that I be allowed to perform the duties of a personnel safety monitor, S.O.P. writer, or any other duties within my unit that would not involve my medical restrictions. I know that the type of work that I suggested that I be allowed to perform is available.... I believe that I am being discriminated against because of my medical condition with my left knee.

Celanese also presented summary judgment evidence showing that Garcia's restrictions were not always what they were after his 1997 surgery. In 1994, after Garcia re-injured his knee while working at Celanese, his doctor's release to return to work stated that Garcia "should perform full duties except no climbing." Two months later, the doctor released him for full duty. These notes were signed by the same doctor who, in 1997, restricted him permanently from climbing, squatting, crawling or kneeling. Moreover, Celenese presented evidence that Garcia's knee was a chronic problem.

Garcia produced no evidence to contradict this evidence. In fact, Garcia concedes the degenerative progression of his knee problem. He stated in 1997, on an intake questionnaire for the City of Corpus Christi Human Relations department that:

I had a work related injury on 1–4–94 where I twisted my knee slipping on glycol. At that time I had arthroscopic surgery on my knee. The Company had no problem letting me back in the day after surgery (crutches, stitches, etc.). After recovering from the surgery, I went back to full duty, but continued having problems with my knee. Still could not kneel or crawl, and having problems climbing. Over the course of the three years continued problems with my knee, receiving cortisone injections and different medications. From the time of returning to full duty worked in an area that requires lots of climbing. In 6–96 it got to the point where I could no longer climb. So I was moved to an area with less climbing required. At that time whenever there was climbing to be done my partner would climb. From that time I continued to have problems with my knee. In April of 1997 the pain was so bad I could not function anymore.

The undisputed summary judgment evidence shows that the alleged defamatory statements were empirically true. The fact that Garcia was never able to fully perform all the functions required by his job does not render untrue the later statement that he *cannot* perform the functions of his job. The undisputed evidence shows that Garcia's knee condition grew progressively worse, and the restrictions placed upon him in 1997 were more severe than they had ever been. Both of Garcia's supervisors stated that with those restrictions, Garcia could not perform the essential functions of a process analyzer mechanic.

In his response, Garcia does not challenge those facts. Rather, he focuses on evidence that he contends shows malice on the part of his supervisors. The closest he comes to controverting Celanese' evidence on the issue of truth is the following unsupported statement in his brief:

Plaintiff has set forth his prima facie case of slander by the communications

made by Stewart Allen and Hector Garcia to the effect that Roel could not do his job with climbing, kneeling, or squatting restrictions when they actually knew that he did his full duties in January of 1995 without almost identical restrictions. They knew their statements to Curtis Blackburn were false.

This is insufficient to raise a fact issue regarding Celanese's affirmative defense of truth. We affirm the trial court's summary judgment on the defamation claims.

### III. DISCRIMINATION CAUSE OF ACTION

Next, Garcia contends the trial court erred in granting summary judgment against him on his discrimination claim. Garcia contends that he was the victim of discrimination because of a physical disability, which is prohibited by the Texas Commission on Human Rights Act (TCHRA). TEX. LABOR CODE ANN. § 21.001 *et. seq.* (Vernon 1996). Celanese counters that Garcia does not have a "disability" as defined by the Act, that his physical condition impairs his ability to reasonably perform his job, and that the accommodations sought by Garcia are not required by the Act.

#### 1. *Is Garcia "Disabled" Under the Statute?*

■ Among other things, the TCHRA prohibits an employer from discharging or otherwise discriminating against an employee because of a disability. TEX. LABOR CODE ANN. § 21.051(a). To set up a prima facie case of discrimination, a plaintiff must make a threshold showing that he has a disability. *Morrison v. Pinkerton Inc.*, 7 S.W.3d 851, 854–55 (Tex. App.—Houston [1st Dist.] 1999, no pet. h.). An individual can be classified as disabled under any one of the three definitions of the term contained in the Act. *Id.* "Disability" is defined as (1) a physical or mental impairment that substantially limits one or more of the major life activities of the individual, (2) a record of such an impairment, or (3) being regarded as having such

an impairment. TEX. LABOR CODE ANN. § 21.002(6) (Vernon's Supp.2000).

■ A "major life activity" is considered to be something akin to "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Hartis v. Mason & Hanger Corp.*, 7 S.W.3d 700, 703 (Tex. App.—Amarillo 1999, no pet. h.) (quoting, 29 C.F.R. § 1630.2(i)). The Code of Federal Regulations provides the example of: "A diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication." 29 C.F.R. § 1630.2(j). Garcia contends that the loss of his kneecap is a such a disability. We disagree.

■ "The determination of whether an individual is disabled is necessarily fact intensive." *Primeaux v. Conoco, Inc.*, 961 S.W.2d 401, 404 (Tex.App.—Houston [1st Dist.] 1997, no writ). In determining if one is substantially limited in a major life activity, we consider:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

*Norwood v. Litwin Engineers & Constructors, Inc.*, 962 S.W.2d 220, 224 (Tex.App.—Houston [1st Dist.] 1998, pet. denied) (quoting 29 C.F.R. § 1630.2(j)(2) (1995)).

The Texas Supreme Court has noted that:

An examination of the entire Act in the Human Resources Code reveals that the legislature was concerned with those physical and mental defects which are serious enough to affect a person's use of public facilities and common carriers, ability to obtain housing, and the ability to cross the street. The intent of the Act was to protect those impaired to the point that they might not be able to

participate in the social or economic life of the state, achieve independence, or become gainfully employed, without this protection. The legislature obviously was not concerned with minor physical or mental defects.

*Chevron Corp. v. Redmon,* 745 S.W.2d 314, 317 (Tex.1987).

Garcia asserts that the deposition testimony of Dr. Swann establishes that he has a disability that substantially limits his ability to perform a major life activity. The doctor's testimony contained the following colloquy:

Q. I'd like to read you a ... three part definition.... If you assume with me that a person is considered disabled if he or she has an impairment that substantially limits one or more of the individual's major life activities, and that the major life activities refers to those basic activities that the average person in the general population can perform with little or no difficulty, and then further assume that major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, reading, learning and working, and that major life activities are not limited to those activities, but may include similar activities, and then if you can further assume that by the term the person being substantially limited, that the person is unable to perform a major life activity that can be performed by the average person that's in the population, ... or else there's a significant restriction on the condition, the manner, the duration which he can perform a particular major life activity compared to the average person in the general population, would you describe Roel's ... lack of a kneecap ... would you say that based on this definition .... that Roel would be a disabled person under that ... definition because of his situation in his knee?

A. Well, yes. I certainly have an opinion in this regard ... And the opinion is ... going to be that he certainly does not have a normal knee. Okay. And, you know, he is certainly not going to ... go out there and play in the NFL.... And when you compare him to a normal person, he isn't normal, okay, to that extent. Now, I can't say that he is totally and permanently disabled where he can't do anything. I mean ... of course, his body functions and everything are all working, except his left knee.... And in that regard, he cannot perform to the extent of a—of a regular person.

Q. Okay. Could he—if her were attempting to be a lineman for the phone company, climbing telephone poles and kneeling down to install telephone jacks in buildings and things like that, could he perform tasks like that with his knee?

A. I would ... and I have restricted him to the point that I do not want him climbing. I do not want him squatting and kneeling. He couldn't do that.

Q. Okay. Could he squat and kneel and put on kneepads or shin guards, rather, and squat down and get on his knee and play Little League baseball and be the catcher for his son's team? Things like that?

A. No, sir.

Q. Okay .... would you say that he has the ability to kneel down in church for ... lengthy periods of time during worship?

A. I certainly ... would not recommend that he kneel down, say for the extent of, say a rosary.

Q. Okay.

A. Something of that nature. I think that we should do everything we can to stay in communication with

the Almighty, and I've certainly allowed people to kneel to pray for a short period of time on padded areas. But, you know, he certainly can't for a prolonged length of time, And I would actually discourage him, unless it's just all necessary that he kneel to pray, period.

Garcia's position is that the life activities he is substantially limited from performing are climbing, squatting, kneeling and crawling. Whether an activity qualifies as a major life activity is determined on more or less a case-by-case basis. Recently, the federal district court for the Southern District of New York held that climbing stairs qualifies as a "major life activity." *See Nodelman v. Gruner & Jahr USA Publishing,* No. 98 Civ. 1231(LMM), 2000 WL 502858 (S.D.N.Y. April 26, 2000) at *7. However, Garcia's doctor testified that he could climb stairs; his restriction is from climbing ladders.

The Supreme Court has offered some guidance in interpreting this provision. It stated that:

"Major life activities" includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 1 CFR § 457.103 When referring to the major life activity of working, the Equal Employment Opportunity Commission (EEOC) defines "substantially limits" as: "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." § 29 CFR 1630.2(j)(3)(i) (1998). The EEOC further identifies several factors that courts should consider when determining whether an individual is substantially limited in the major life activity of working, including "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within [the] geographical area [reasonably accessible to the individual], from which the individual is also disqual-

ified." § 1630.2(j)(3)(ii)(B). Thus, to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job. *See* § 1630.2(j)(3)(i) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working").

*Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2142, 144 L.Ed.2d 450 (1999).

The southern district of New York found that an obese plaintiff was not substantially limited in a major life activity even though she could not kneel or bend because of her weight. *Hazeldine v. Beverage Media, Ltd.,* 954 F.Supp. 697, 704 (S.D.N.Y.1997); The Fourth Circuit found that, as a matter of law, a twenty-five pound lifting limitation does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity. *Williams v. Channel Master Satellite Systems, Inc.,* 101 F.3d 346 (4th Cir. 1996) *cert. denied sub nom, Williams v. Avnet, Inc.,* 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997). In another case, the Southern District of New York found that an individual's medical restriction of "no prolonged sitting" did not render her disabled under the ADA, because it did not substantially limit any major life activity, including her ability to work. *Wernick v. Federal Reserve Bank of New York,* 1995 WL 598973 (S.D.N.Y. Oct.10, 1995), *aff'd,* 91 F.3d 379 (2d Cir.1996). Closer to home, the Southern District of Texas found that an employee's knee injury was not a substantially limiting impairment where the physician limited squatting and climbing and prohibited crawling, but where the plaintiff's deposition showed that he performs strenuous yard work, climbs three and one-half flights of stairs in one minute, and lifts 70 pounds easily. *Smith v. United Parcel Service,* 50 F.Supp.2d 649 (S.D.Tex.1999). The Northern District of Indiana found that a plaintiff's knee injury did not substantially limit major life activi-

ties where, at the time of his physician's deposition, the plaintiff was able to stand, squat, bend, lift 100 pounds and run. *Hites v. Patriot Homes, Inc.*, 904 F.Supp. 880, 883–84 (N.D.Ind.1995). That court also held that an employee was not disabled where he sought medical attention for his dislocated knee cap only twice, and within four months after the injury was able to walk, stand, carry up to 50 pounds and drive a motor vehicle without restriction, but one year later was still unable to do repetitive climbing. *Kelly v. Woodridge Park District*, 1999 WL 203020 (N.D.Ill. March 31, 1999) at *2. *See also Robinson v. Global Marine Drilling Co.*, 101 F.3d 35, 37 (5th Cir.1996) (holding that individual with asbestosis who suffered only a few instances of shortness of breath while climbing stairs was not substantially limited in the major life activity of breathing); *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir.1997) (noting that cases make clear that moderate difficulty or pain experienced while walking does not rise to level of disability); *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1120 (5th Cir.1998) (holding that plaintiff failed to establish that back injury substantially limited the major life activity of lifting where evidence tended to prove only that she was restricted from heavy lifting, not the routine duties of daily living, and was thus insufficient for reasonable jury to find substantial limitation on major life activity); *Miller v. Airborne Exp.*, 1999 WL 47242, at *5 (N.D.Tex. Jan.22, 1999) (holding that plaintiff's preference to lean on rail rather than stand, and of a need to rest or sit after standing for more than 30 minutes, did not demonstrate that injury to left knee left him unable to stand or that he was significantly restricted as compared to the condition, manner, or duration under which the average person could stand); *Dickerson v. United Parcel Serv.*, 1999 WL 966430, at *4 (N.D.Tex. Oct.21, 1999) (holding that plaintiff failed to raise genuine fact issue that he was substantially impaired in the major life activity of standing where his physician did not aver that plaintiff was unable to stand or that he was significantly restricted with respect to this activity when compared to the average person, and plaintiff's static standing tolerance of only about five minutes at a time was still within the normal range, considering plaintiff's age and sex).

While loss of a kneecap is a serious impediment, we do not believe it rises to the level of the type of "disability" contemplated by the anti-discrimination act. Crawling, squatting, climbing ladders and kneeling are not the same type of "major life activities" as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. *See Sutton*, 119 S.Ct. at 2139 (citing 1 CFR § 457.103).

 Even if working in general is the major life activity that Garcia points to as being substantially limited, we do not believe that his restrictions rise to the level of significantly reducing his ability to work in a class of jobs or a broad range of jobs as compared to the average person having comparable training, skills and abilities. When the activity is "working," the individual's impairment substantially limits the activity when the impairment severely restricts or forecloses his ability to work in general. 29 C.F.R. § 1630.2(j)(3)(i); *Redmon*, 745 S.W.2d at 318; *Azubuike*, 970 S.W.2d at 63–64; *Chandler v. City of Dallas*, 2 F.3d 1385, 1391–93 (5th Cir.1993), *cert. denied* 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994). In other words, it is not enough that the employee asserting a disability cannot perform a single or particular job or a narrow range of jobs. *Azubuike*, 970 S.W.2d at 63–64. As the Supreme Court pointed out in *Sutton*,

> [C]reating physical criteria for a job, without more, does not violate the ADA. The ADA allows employers to prefer some physical attributes over others, so long as those attributes do not rise to the level of substantially limiting impairments. An employer is free to decide that physical characteristics or medical

conditions that are not impairments are preferable to others, just as it is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job.

*Sutton,* 119 S.Ct at 2142–43.

We hold that Garcia's knee injury does not substantially limit a major life activity, and is thus, not covered by the anti-discrimination act. We affirm the trial court's grant of summary judgment.

## IV. WORKERS' COMPENSATION RETALIATION CAUSE OF ACTION

■ Next, Garcia contends that he was fired in retaliation for his filing of a workers' compensation claim. Texas Labor Code Section 451.001 states:

A person may not discharge or in any other manner discriminate against an employee because the employee has:

(1) filed a workers' compensation claim in good faith;

(2) hired a lawyer to represent the employee in a claim;

(3) instituted or caused to be instituted in good faith a proceeding under Subtitle A; or

(4) testified or is about to testify in a proceeding under Subtitle A.

TEX. LAB.CODE ANN. § 451.001 (Vernon 1996).

■ The employee has the burden of demonstrating a causal link between the discharge and the filing of the claim for workers' compensation benefits. *McIntyre v. Lockheed Corp.,* 970 S.W.2d 695, 697 (Tex.App.—Fort Worth 1998, no pet.); *Duhon v. Bone & Joint Physical Therapy Clinics,* 947 S.W.2d 316, 318 (Tex.App.—Beaumont 1997, no writ). This causal connection is an element of the employee's prima facie case and may be established by direct or circumstantial evidence. *McIntyre,* 970 S.W.2d at 697; *Duhon,* 947 S.W.2d at 319. Once the employee has established the causal link, the employer bears the burden to rebut the alleged im-

proper termination by showing there was a legitimate reason behind it. *McIntyre,* 970 S.W.2d at 697–98; *Duhon,* 947 S.W.2d at 319. Thereafter, in order to survive a motion for summary judgment, the burden shifts back to the employee to produce controverting evidence of a retaliatory motive. *McIntyre,* 970 S.W.2d at 697–98; *Duhon,* 947 S.W.2d at 319.

The Texas Supreme Court has offered guidance on how a plaintiff can establish that causal connection:

A plaintiff does not have to prove that her discharge was solely because of her workers' compensation claim.... She merely has to establish the "causal connection" between her discharge and the filing of a workers' compensation claim as an element of her prima facie case.... Circumstantial evidence, and the reasonable inferences from such evidence, can prove the causal connection.... Once the link is established, it is the employer's burden to rebut the alleged discrimination by showing there was a legitimate reason behind the discharge....

Circumstantial evidence sufficient to establish a causal link between termination and filing a compensation claim includes: (1) knowledge of the compensation claim by those making the decision on termination; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false....

*Continental Coffee Products Co. v. Cazarez,* 937 S.W.2d 444, 450–51 (Tex.1996) (internal citations omitted).

We hold that Garcia has failed to offer evidence raising a genuine issue of material fact with regard to the elements above. In its motion for summary judgment, Celanese articulated a legitimate nondiscriminatory reason for terminating Garcia. It

offered evidence that the company has a "restricted duty policy" which states that restricted duty is only available when the employee is progressing toward unrestricted duty. While Garcia was allowed to modify his duties prior to the 1997 surgery, he was not given "light duty" once his doctor instituted permanent restrictions against him climbing, crawling, squatting or kneeling. The El Paso court of appeals heard a similar case where the employee was allowed to perform light duty at one period of employment, then not allowed later. The court stated:

> [The employee] suggests that evidence of discrimination is found in the different manner in which the company treated him before and after he filed the workers' compensation claim in May of 1989. Following the laceration of his finger in 1988, [the employee] was permitted to work in a light duty job for several weeks while he recovered. When he attempted to return to work in 1990, he was informed there were no light duty jobs available. The employer presented no evidence that a light duty job existed or was available at any time after May of 1989. In the absence of any policy or practice to the contrary, the company's refusal to create a light duty job for [the employee] does not give rise to an inference of discrimination or retaliation. Further, both decisions were made pursuant to the company's light duty policy which permits a person to return to work if their recuperation is expected to take less than thirty work shifts. [The employee] was given a light duty job in 1988 because it was believed that he would recuperate from the lacerated finger in a short period of time, whereas it was apparent that his recuperation from carpal tunnel syndrome would require substantially longer. Because there is no evidence of discriminatory application or impact on workers' compensation claimants in general or on [the employee] in particular, we cannot infer a negative attitude or discrimination in violation of Section 451.001 from the existence of this otherwise lawful employment policy.

*Urquidi v. Phelps Dodge Refining Corp.*, 973 S.W.2d 400, 405 (Tex.App.—El Paso 1998, no pet.)

■ The only evidence that Garcia has is that the person making the termination decision knew about his workers' compensation claim. But the fact that the person making the termination decision had knowledge of the claim, standing alone, does not satisfy the *Continental Coffee* standard. *Id.* at 404. Rather, it "simply places [Garcia] within the protected class and must be considered along with the remaining evidence." *Id.* at 404. Moreover, an employer is permitted to terminate an employee who sustains a job-related injury if it ultimately appears that, due to the nature of the injury, the employee can no longer perform the essential functions of his position. *Burfield v. Brown, Moore & Flint, Inc.*, 51 F.3d 583, 590 (5th Cir.1995); *Schrader v. Artco Bell Corp.*, 579 S.W.2d 534, 540 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.). Garcia has produced no evidence to establish the causal link between his filing of the workers' compensation claim and his termination. We overrule this point of error and affirm the trial court's grant of summary judgment on Garcia's workers' compensation retaliation claim.

## V. TRIAL COURT'S DENIAL OF MOTION FOR NEW TRIAL

■ Finally, Garcia contends the trial court erred in denying his motion for new trial urged on grounds of newly discovered evidence. Garcia alleges that a defense witness, Donna Beltran, withheld material evidence from him by denying any knowledge of the facts surrounding the release of Theodore Hernandez in her deposition. Garcia contends that a new trial should have been granted because of the newly discovered evidence in the form of Theodore Hernandez' affidavit.

Theodore Hernandez's affidavit stated that he is a former Celanese employee who worked there almost twenty years, ending in January of 1997. He lost his left arm in an on-the-job accident in 1980, but continued working there until January of 1997, when he was diagnosed with degenerative disc disease. After undergoing physical therapy, he was released to return to work by his doctor, but was told by Donna Beltran that he could not return to work because of his physical limitations. She instructed him to see a different doctor for an evaluation. This doctor said that Hernandez could not return to work because of his limitations related to his missing arm.

Hernandez filed suit against Celanese and Donna Beltran was a witness in the case. Beltran was also one of the persons who notified Garcia that he would not be allowed to return to work because of his limitations. Hernandez states that he believes that Celanese is placing many of its employees on long-term disability in order to reduce its work force.

Garcia contends Donna Beltran gave misleading and perjured testimony regarding Hernandez at her deposition that prevented Garcia from discovering Hernandez' affidavit. We do not agree that Beltran's testimony prevented Garcia from obtaining the evidence from Hernandez. The deposition excerpt that Garcia offered in support of his motion for new trial states:

Q. Did any of the policies that you were working under change between 1991 and 1997 at Celanese about persons that had physical limitations?

A. Not to my knowledge.

Q. Did management attitudes change during that time period about people that had physical limitations?

A. No, sir.

Q. It's my understanding there's a fellow who had an accident and lost a part of one of his arms and was recently released from employment with Celanese. Have you worked on that case?

A. No, sir. I have not.

Q. Are you aware of any case like that from Celanese Bishop plant?

A. I know of an individual who had lost an arm. I don't know the specifics after that.

Q. You didn't do any medical work-up on that investigation for the company, nothing like that?

A. No, sir.

Q. Communications with the doctors?

A. No, sir.

Q. Are you aware of any other situations where persons with physical limitations were released from work in the last—well, I should say two years I guess—in the 1996, 1997 time periods?

A. Was anyone released back to work?

Q. Well, that was released from employment because of physical restrictions.

A. No.

Q. The only one you know of was Roel?

A. Well, I don't know that he was released for that reason.

Q. You don't know why he was released from employment?

A. I don't know that he was released, period.

Q. Okay. Nobody's told you that he's on a medical leave? Maybe it's leave, I'm not sure how they call it now.

A. All I know is that Roel was on sick leave and [end of excerpt].

 We review denials of motions for new trial based on newly discovered evidence under an abuse of discretion standard. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex.1983); *Alvarez v. Anesthesiology Associates*, 967 S.W.2d 871, 882 (Tex.App.—Corpus Christi 1998, no pet.). In order to obtain a new trial, a plaintiff must show that: (1) the evidence has come

to their attention since the trial; (2) it was not discovered earlier due to the lack of diligence; (3) the evidence is not cumulative; and (4) it is so material that it would produce a different result if a new trial were granted. *Jackson,* 660 S.W.2d at 809; *Alvarez,* 967 S.W.2d at 882. Garcia's argument fails on two points.

First, Garcia has not shown that he exercised diligence in attempting to discover the evidence earlier. At Beltran's deposition, he asked about Hernandez. He could have followed up on that line of questioning with either Beltran or another witness to discover Hernandez' name, and then followed up by questioning Hernandez himself. Indeed, the fact that he knew to ask about Hernandez in that deposition indicates that he had some knowledge of Hernandez's situation. There is no indication that Garcia attempted to follow up on that matter until after summary judgment was granted. We do not believe that Beltran's deposition testimony represents an attempt to hide that evidence from Garcia.

■ Second, Hernandez's affidavit is not material. The only cause of action that it might be relevant to is whether the corporation impermissibly discriminated against Garcia because of a disability. We have already held that Garcia does not qualify for relief under the disability statute. Evidence that another person was treated in the same way that Garcia was treated does not change the fact that the statute is inapplicable. We overrule Garcia's last point of error, and affirm the judgment of the trial court in all respects.