NUMBER 13-99-778-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

__________________________________________________________________


UNION CARBIDE CORPORATION , Appellant,


v.


DELFA MAYFIELD , Appellee.

__________________________________________________________________


On appeal from the County Court at Law No. 1

of Calhoun County, Texas.

__________________________________________________________________


O P I N I O N

Before Justices Dorsey, Rodriguez, and Seerden (1)

Opinion by Justice Dorsey


Union Carbide Corporation appeals from a judgment, following a jury verdict, awarding Delfa Mayfield damages for his
suit for discrimination under the Texas Commission on Human Rights Act (the TCHRA). (2) Carbide appeals by ten issues. 
We reverse and render. 

I. Factual Background

For his entire life Delfa Mayfield suffered from extreme pes planus or flat-footedness in both feet. This condition caused
him chronic intermittent foot pain. He served as a combat medic in the U.S. Army but was honorably discharged because of
his flat feet. Afterwards he became a paramedic and worked for the Victoria and Refugio EMS Departments. Working as a
paramedic required him to stand on his feet, carry people up and down stairs, and climb some stairs and ladders. Climbing
caused him sporadic pain, but the pain never kept him from doing his job, and he successfully climbed all the stairs and
ladders that he had to climb.

He also worked for Brown & Root as a safety coordinator. At this job he climbed stairs and ladders, which caused him
"on-and-off" pain. However the pain did not prevent him from doing a good job, and no one at Brown & Root ever
indicated they had a problem with his work because of his foot condition.

About 1990, Mayfield went to work for Union Carbide as a rigger. On May 14, 1991, Dr. Lisch, a podiatrist, operated on
Mayfield's right foot. In a letter (3) dated May 29, 1991, Dr. Lisch stated that

Because of his lack of arch support he can not comfortably bear weight for any prolonged period of time and requires a job
that is both sitting and standing. Any job with prolonged standing or climbing will only result in a possible rupture or
irritation of the tendons that hold the arch up.

Although the surgery was successful Mayfield continues to have pain in his feet from time to time. After the surgery Dr.
Crabtree, Carbide's company doctor, restricted him from climbing ladders and stairs. These restrictions kept him from
effectively doing his rigger's job, and Carbide terminated him in January, 1992.

After his termination Mayfield sued Carbide in federal court. The parties settled the suit on terms that required Carbide to
reinstate Mayfield as an operator. In connection with his reinstatement Carbide required him to provide a letter from his
doctor, releasing him to work as an operator. On May 1, 1995, Dr. Wilcox wrote a letter in which he released Mayfield "to
full duty with no restrictions."

On May 25, 1995, Mayfield saw Dr. Cranston, Carbide's plant physician, for a pre-employment physical. Mayfield gave
him the work release and a medical history which showed that he had foot pains. Also he told Dr. Cranston about his flat
feet. Dr. Cranston testified that Mayfield's case of pes planus was probably the most extreme he had ever seen. However he
did not think that he needed any work restrictions due, in part, to Dr. Wilcox's release.

As an operator Mayfield was frequently on his feet and had to climb stairs and ladders. His feet sometimes hurt when he
was on the job. The longer he spent on a ladder, the more his feet would hurt. Mayfield testified, though, that his feet
never kept him from doing his operator's job. His supervisor, John Schmidt, gave him favorable evaluations and did not
recall Mayfield complaining about having sore feet. Schmidt also did not recall Mayfield having any problems doing his
job.

In addition to working as an operator Mayfield was a member of Carbide's emergency response squad at the plant. In
connection with this activity, on July 8, 1996, he saw Dr. Cranston for an EMT physical. (4) At this time he told Dr.
Cranston that he had pain in his right foot. Dr. Cranston told him to return if "things got worse." After the physical Dr.
Cranston still rated Mayfield as "Class A," meaning that he qualified to do any job at the plant.

On July 29, 1996, Mayfield returned to Dr. Cranston. Mayfield's testimony was that he returned on Dr. Cranston's request
and that his feet had not gotten any worse. Dr. Cranston testified that Mayfield returned, complaining that his foot pain was
worse because of stair and ladder climbing. According to Dr. Cranston, Mayfield's right foot was "quite swollen." Dr.
Cranston wrote in his medical notes that Mayfield had "foot pain aggravated by ladder and stair climbing" and put him on
"indefinite restrictions of no ladder or frequent stair climbing. . . ." He sent Mayfield to Dr. Reilly, a podiatrist, for an
independent medical examination. Dr. Cranston testified that "Dr. Reilly confirmed that his foot was grossly swollen, very
tender to the touch." Dr. Cranston also testified that Dr. Reilly recommended that Mayfield should not climb ladders or
stairs anymore.

On August 7, 1996, Dr. Cranston met with Mayfield to discuss Dr. Reilly's findings. At this time Dr. Cranston issued
permanent work restrictions for Mayfield of no climbing of ladders or scaffolds and no frequent stair climbing. Regarding
this meeting, Dr. Cranston wrote in his notes that:

Discussed employee's options. He's not interested in pursuing ankle arthroscopy. His foot feels much better since he has
been on restrictions. He agreed ladder climbing is not in his best interest, and we agreed that will probably always be the
case even if he had any further surgery. Examined foot today. It shows minimal swelling and no discomfort. Current
restrictions of no ladder or scaffold work and no frequent stair climbing written.

Dr. Cranston had two main reasons for issuing the permanent restrictions. First he relied on Dr. Reilly's recommendation
that Mayfield avoid ladder and stair climbing. Second he relied on Dr. Lisch's May 29, 1991 letter (5) which stated that "Any
job with prolonged standing or climbing will only result in a possible rupture or irritation of the tendons that hold the arch
up." Dr. Cranston shared Dr. Lisch's concern. Dr. Cranston was conerned that Mayfield may do irreparable damage to the
tendons, and that he might fall and hurt himself or someone else.

On August 14, 1996, Dr. Cranston received a letter from Mayfield, asking Dr. Cranston to lift the restrictions. He also
stated that "Dr. Reilly, . . . says my pain can be fixed by arthroscopy. I am able to climb stairs and to climb ladders. Due to
my foot pain, especially my right ankle, I have discomfort. But I still can do my job as shown by my evaluation."

On September 4, 1996, Mayfield and Dr. Cranston discussed the letter. Dr. Cranston testified that he told Mayfield that he
"could not ethically put him in harm's way by removing the restrictions" but "advised him that it was his right to pursue the
ankle arthroscopy if he wanted to." Dr. Cranston also testified that "if we continued to let him do the climbing that he was
doing that he would be going into harm's way and do irreparable damage to his foot."

After Carbide put restrictions on Mayfield he went to truck-driving school. As of September 27, 1996, he had finished
truck driving school and received a certificate.

The restrictions kept Mayfield from doing his operator's job. Accordingly in October, 1996, Carbide removed him from
this job (which paid about $18 per hour) and offered him a safety clerk's job (which paid about $12 per hour). He refused
the job because he wanted to work as an operator, and he did not like the reduced pay. Upon refusing the clerk's job
Carbide terminated him. After losing his operator's job Mayfield went to work as a paramedic, and he also worked as a
truck driver.

II. The Litigation

Mayfield sued Carbide for wrongful discharge on the basis of disability under the TCHRA. He contended that: (1) Carbide
erroneously regarded him as disabled in the major life activity of working by removing him from his operator's job; (2)
Carbide's restrictions on Mayfield constituted a record of an impairment that substantially limited his major life activity of
working; and (3) Carbide regarded him as having a physical impairment that substantially limited his major life activity of
working. The jury awarded him $100,964.58 in compensatory damages and $50,000 in punitive damages. The trial court
then awarded him $490,211.41 as lost future wages and benefits, and $275,725.11 for attorneys' fees and costs.

III. The TCHRA

The TCHRA prevents an employer from discharging or discriminating against an employee based upon "disability," which
is defined to mean "a mental or physical impairment that substantially limits at least one major life activity of that
individual, a record of such an impairment, or being regarded as having such an impairment." Tex. Lab. Code Ann. §
21.002(6) (Vernon Supp. 2001) (emphasis added); Azubuike v. Fiesta Mart, Inc., 970 S.W.2d 60, 63 (Tex. App.-Houston
[14th Dist.] 1998, no pet.).

To set up a prima facie case of discrimination a plaintiff must make a threshold showing that he has a disability. Garcia v.
Allen, 28 S.W.3d 587, 596 (Tex. App.-Corpus Christi 2000, pet. denied). An individual can be classified as disabled under
any one of the three definitions of the term contained in the Act. Id. Under the statute, a person is defined as disabled if he
either (1) is actually disabled, (2) is regarded as being disabled, or (3) has a record of being disabled. Tex. Lab. Code Ann.
§ 21.002(6). For all three, the word "disabled" is defined the same--i.e., having a mental or physical impairment that
substantially limits at least one major life activity. Id.

A "major life activity" is considered akin to "caring for oneself, performing manual tasks, walking, seeing, hearing,
speaking, breathing, learning, and working." Id. at 596. Hartis v. Mason & Hanger Corp., 7 S.W.3d 700, 703 (Tex.
App.--Amarillo 1999, no pet.) (quoting 29 C.F.R. § 1630.2(i)). The Code of Federal Regulations provides the example of: 
"A diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot
perform major life activities without the aid of medication." 29 C.F.R. § 1630.2(j). Mayfield contends that his
flat-footedness is such a disability. We disagree.

The Texas Supreme Court has stated that a disability as contemplated by the TCHRA "must be one which is generally
perceived as severely limiting [plaintiff] in performing work-related functions in general." Chevron Corp. v. Redmon, 745
S.W.2d 314, 318 (Tex. 1987). The Redmon Court further stated: 

An examination of the entire Act in the Human Resources Code reveals that the legislature was concerned with those
physical and mental defects which are serious enough to affect a person's use of public facilities and common carriers,
ability to obtain housing, and the ability to cross the street. The intent of the Act was to protect those impaired to the point
that they might not be able to participate in the social or economic life of the state, achieve independence, or become
gainfully employed, without this protection. The legislature obviously was not concerned with minor physical or mental defect.

Id. at 317.

In determining if a person is substantially limited in a major life activity we consider: (1) the nature and severity of the
impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the
expected permanent or long-term impact of or resulting from the impairment. Garcia, 28 S.W.3d at 596; Norwood v.
Litwin Engineers & Constructors, Inc., 962 S.W.2d 220, 224 (Tex. App.--Houston [1st Dist.] 1998, pet. denied) (quoting
29 C.F.R. § 1630.2(j)(2) (1995)). Mayfield's position is that the life activities he is substantially limited from performing
are climbing ladders and frequent stair climbing. Whether an activity qualifies as a major life activity has been determined
on a case-by-case basis. Garcia, 28 S.W.3d at 598.

The federal district court for the Southern District of New York held that climbing stairs qualified as a "major life activity." 
See Nodelman v. Gruner & Jahr USA Publishing, No. 98 Civ. 1231(LMM), 2000 WL 502858 (S.D.N.Y. April 26, 2000) at
*7. In our case Dr. Cranston restricted Mayfield from climbing ladders, scaffolds, andfrequent stair climbing. He testified
that "'frequent' in this case meant that no repetitive, over and over and over again." His testimony was that the intent of the
restriction was to prevent repetitive stair climbing. He did not want Mayfield going up and down stairs all day long. 
Mayfield could still climb stairs to go to and from his job and take his breaks.

The United States Supreme Court has offered some guidance in interpreting this provision. It stated that:

"Major life activities" includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing,
speaking, breathing, learning, and working. 1 CFR § 457.103. When referring to the major life activity of working, the
Equal Employment Opportunity Commission (EEOC) defines "substantially limits" as: "significantly restricted in the
ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having
comparable training, skills and abilities." § 29 CFR 1630.2(j)(3)(i) (1998). The EEOC further identifies several factors
that courts should consider when determining whether an individual is substantially limited in the major life activity of
working, including "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within [the]
geographical area [reasonably accessible to the individual], from which the individual is also disqualified." §
1630.2(j)(3)(ii)(B). Thus, to be regarded as substantially limited in the major life activity of working, one must be regarded
as precluded from more than a particular job. See § 1630.2(j)(3)(i) ("The inability to perform a single, particular job does
not constitute a substantial limitation in the major life activity of working"). 

Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S.Ct. 2139, 2142 (1999).

IV. Analysis

1. Dr. Carl Hansen's Testimony.

Before addressing the merits of this case we must first discuss Carbide's sixth issue asserting that the trial court erred in not
excluding the testimony of Mayfield's expert, Dr. Carl Hansen. The trial court held a hearing to determine the admissibility
of the testimony, and afterwards, ruled that he could testify.

A. Applicable Law

A trial court's admission of expert testimony is reviewed by this Court under an abuse of discretion standard. K-Mart Corp.
v. Honeycutt, 24 S.W.3d 357, 360 (Tex. 2000). This Court will only overturn a trial court's decision to admit such evidence
upon finding that the trial court's ruling is arbitrary, unreasonable or without reference to any guiding rules or legal
principles. Id. We find no abuse of discretion in the trial court's admission of Dr. Hansen's testimony.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine
a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in
the form of opinion or otherwise. Tex. R. Evid. 702. Otherwise admissible opinion testimony is not objectionable because
it embraces an ultimate issue of fact. Tex. R. Evid. 704.

A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony
must be relevant and be based on a reliable foundation. E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 556
(Tex. 1995). The trial court makes the initial determination about whether the expert and the proffered testimony meet
these requirements. Id. The trial court has broad discretion to determine admissibility, and we will reverse only if there is
an abuse of that discretion. Id. at 558.

In deciding if an expert is qualified trial courts "must ensure that those who purport to be experts truly have expertise
concerning the actual subject about which they are offering an opinion." Gammill v. Jack Williams Chevrolet, Inc., 972
S.W.2d 713, 719 (Tex. 1998) (quoting Broders v. Heise, 924 S.W.2d 148, 152 (Tex. 1996)). To gauge reliability the
Gammill Court explained: 

Daubert and Rule 702 demand that the district court evaluate the methods, analysis, and principles relied upon in reaching
the opinion. The court should ensure that the opinion comports with applicable professional standards outside the
courtroom and that it will have a reliable basis in the knowledge and experience of the discipline.

Id. at 725-26 (quotations omitted). In Robinson the supreme court identified six nonexclusive factors to determine whether
an expert's testimony is reliable and thus admissible. Robinson, 923 S.W.2d at 557. But in Gammill the court recognized
that the Robinson factors may not apply to certain testimony. Gammill, 972 S.W.2d at 726. In those instances, there still
must be some basis for the opinion offered to show its reliability, and, ultimately, the trial court must determine how to
assess reliability. Gammill, 972 S.W.2d at 726. If an expert relies upon unreliable foundational data, any opinion drawn
from that data is likewise unreliable. Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 714 (Tex. 1997). Further an
expert's testimony is unreliable even when the underlying data is sound if the expert's methodology is flawed. Id.

B. Analysis

Dr. Hansen had master's and doctorate degrees in vocational rehabilitation counseling. He worked in the field as a
rehabilitation counselor and then worked twenty-six years as a professor at the University of Texas training rehabilitation
counselors. After retiring from UT he worked in private practice where he counseled disabled persons. He also placed
persons with medical restrictions in jobs in geographic areas. Regarding this case he was asked to look at Mayfield's
restrictions in relationship to his education, training, and transferability of skills within his industry and a broad range of
jobs. To do this Dr. Hansen had to (1) consider whether Carbide's restrictions would cause Mayfield to have problems in
the labor market if the restrictions were applied broadly outside of his current or past employer, (2) look at a "class of jobs"
or a "broad range of jobs in various classes" and compare them to an average person having the same kind of training,
skills, and abilities, and (3) consider the geographical area where Mayfield resided or could find employment.

In performing his analysis Dr. Hansen considered three factors: (1) Mayfield's age, education, and work history; (2) the
geographic area in which Mayfield would reasonably find employment; and (3) Carbide's restrictions upon Mayfield's
physical capacity to perform work within an industry similar to the one he had worked in within this geographical area. 
Mayfield's geographical area, known as the Golden Crescent, included Calhoun, DeWitt, Goliad, Jackson, Lavaca and
Victoria Counties. Dr. Hansen looked at the employers who normally would hire a person with Mayfield's skills. He also
considered Mayfield's two principal skills, operator and emergency medical technician (EMT). Dr. Hansen determined the
number and types of jobs in the Golden Crescent by using information from the Texas Workforce Commission. He stated
that the U.S. Department of Labor had conducted studies to analyze the various jobs that exist in the nation. This
information is published in the Dictionary of Occupational Titles. He used this dictionary, along with a computer program
called "Life Step," to determine if Mayfield's abilities would fit within certain jobs, or if he could transfer into other jobs.

1. Class of Jobs

Dr. Hansen used Carbide's information to determine the percentage of jobs that Mayfield could do at its Seadrift plant (the
plant where Mayfield had worked). The plant had 971 employees and 674 of these jobs required "some stair or ladder
climbing." Thus the restrictions excluded Mayfield from 69.5 percent (674 out of 971) of the jobs at the plant.

Dr. Hansen also determined the percentage of jobs available to Mayfield outside the Seadrift plant. In doing so he looked
at the number of jobs existing in the Golden Crescent. This area had sixteen employers with nine plants producing
chemicals, plastics, and aluminum. These plants had 7,323 workers. Dr. Hansen applied the formula of 69.5 percent of
lost jobs to the 7,323 figure. Thus Mayfield would have a loss of 5,089 jobs out of the 7,323 jobs.

2. Broad Range of Jobs.

Dr. Hansen said that "broad range of jobs" means those jobs which Mayfield could transfer his skills as an operator and
EMT. For this purpose Dr. Hansen used the Life Step program to analyze the Department of Labor information to find that
Mayfield's skills would transfer into 41 other kinds of jobs all of which demanded that the worker perform light or medium
type of work and not sedentary work. Dr. Hansen interpreted Mayfield's restrictions to mean that he could only do
sedentary work.

Dr. Hansen verified his methodology. He considered a number of reports that had been written by other people who had
the same training and background doing the same type of analysis that he did. He reviewed their methodology and
determined that it was the same as his. 

On cross-examination Dr. Hansen said that he had no evidence that other companies would place the same restrictions on
Mayfield. He only had evidence of what the perception would mean in the labor market. He was asked to determine what
jobs are precluded on the basis of Carbide's perception of Mayfield's limitations and relation to the work site and then apply
it to all work sites. He had never before performed this type of analysis, but he had used the Dictionary of Occupational
Titles and Department of Labor information to analyze jobs. 

To determine whether Dr. Hansen is a qualified expert, the question is whether he has scientific, technical, or other
specialized knowledge that would assist the jury to understand this evidence. See Tex. R. Evid. 702. We conclude that Dr.
Hansen's knowledge would aid the jury in understanding the evidence. Accordingly we conclude that the trial court did not
abuse its discretion in finding Dr. Hansen qualified to testify. His testimony is reliable because he stated the basis and
methodology behind his opinion. Dr. Hansen's experience, coupled with his thorough testimony about the methodology he
used, demonstrate that the opinions he drew from the underlying data are reliable. See Gammill, 972 S.W.2d at 726. Thus,
we conclude that the trial court did not abuse its discretion by admitting Dr. Hansen's testimony. We overrule the sixth
issue.

Dr. Hansen's Testimony Before the Jury

During the trial of this case Dr. Hansen testified that he applied the restrictions found in Plaintiff's Exhibit 32. This
document shows restrictions of "no ladder or scaffold work [and] no frequent stair-climbing." (emphasis added). Carbide
issued these restrictions on August 7, 1996, which was the date Dr. Cranston issued the permanent restrictions. Dr. Hansen
testified, however, that the restrictions he actually used for his analysis were "no stair climbing, no ladders, no scaffolding
work." (emphasis added). His understanding, based upon the records he relied upon, was that the director of the Seadrift
plant and the other officials "signed off that no ladder climbing and no stair climbing would be involved for [Mayfield]."

Dr. Hansen said that the restrictions eliminated from consideration Mayfield's class of jobs; i.e., jobs that a person has
learned through on-the-job training, experience, and skill and jobs that are closely related. Mayfield's class of jobs included
operator, EMT, and about forty-one other jobs. Dr. Hansen said that "[t]hose jobs all call for light-to-medium-type
activities. When we take away a person's ability to climb, to use ladders, to use stairs, he's basically in a sedentary
occupation; and that's what I considered that he had been reduced to, sedentary work."

Dr. Hansen stated that "range of jobs" included jobs that a person could potentially engage in and not necessarily jobs based
on training or experience. In determining the effect of the restrictions Dr. Hansen considered their effect within Carbide's
Seadrift plant. Carbide's information showed that as of October, 1996 (the time Carbide terminated Mayfield), the Seadrift
plant had 971 employees and that 674 of these jobs required "some stair and ladder climbing." Dr. Hansen did not know
the extent of the stair or ladder climbing involved in the 674 jobs. Nevertheless his testimony was that based upon the
restrictions Mayfield was prevented from performing about sixty-nine to severty percent of the jobs (674 out of 971) at the
Seadrift plant, because these jobs required some ladder or stair climbing. This constituted the range of jobs available at the
Seadrift plant. He concluded that the restrictions forced Mayfield into sedentary work. (6)

On cross-examination counsel questioned Dr. Hansen about his testimony concerning the plant management's prohibition
against any stair or ladder climbing for Mayfield. When counsel asked him what he was referring to, Dr. Hansen said that
he was referring to an earlier exhibit. This exhibit, Exhibit 30, is an injury/illness classification routing form. The form
shows restrictions of "No stair or ladder climbing." (7) These restrictions were issued on July 29, 1996. Carbide's plant
manager signed the form on July 30, 1996, about a week before Dr. Cranston issued the permanent restrictions of no ladder
climbing or frequent stair climbing.

Dr. Hansen admitted that when he performed his analysis he did not consider the fact that Mayfield had a license to drive a
truck. He never interviewed Mayfield about his current skills. He said that he "was only asked to give what [Mayfield's]
work history would tell us and the impact the medical restrictions would have on his work history." Carbide's counsel
questioned Dr. Hansen about a document prepared by Carbide's human resources department. This document listed
Mayfield's restrictions as "no ladder or scaffold work, no frequent stair climbing." Carbide used this document to
determine if their were job openings in its plant for Mayfield. Dr. Hansen concluded that the restrictions forced Mayfield
into sedentary work "because when he was restricted from ladder and stair climbing in his usual and customary
occupations, it restricted him then, in the eyes of his employer, to sedentary work." His conclusion about how Carbide
perceived Mayfield was not based on interviews with Carbide's personnel, including Dr. Cranston. When asked if he knew
whether anyone outside of Carbide would know about the restrictions he said, "that's up to the company, how they pursue
and evaluate." He did not know whether another company would agree or disagree with the restrictions.

2. Impairment Substantially Limiting Major Life Activity

By issue one Carbide asserts that the trial court erred in failing to find as a matter of law that Mayfield was not "regarded
as" disabled. Question one of the charge asked the jury "Did Union Carbide remove Delfa Mayfield from his operator
position because it regarded him as having a physical impairment that substantially limited him in the major life activity of
working?" The jury answered affirmatively. Carbide argues that Mayfield's flat-footedness does not qualify as a
"disability" as defined in the TCHRA, and therefore, he is not protected under the Act as a matter of law.

As earlier stated "disability" means "a mental or physical impairment that substantially limits at least one major life activity
of that individual, a record of such an impairment, or being regarded as having such an impairment." Tex. Lab. Code Ann.
§ 21.002(6) (Vernon Supp. 2001). A case similar to the one before us is Garcia v. Allen, 28 S.W.3d 587 (Tex.
App.-Corpus Christi 2000, pet. denied). In that case Hoechst Celanese hired Roel Garcia to work as a technician. Garcia
had no left kneecap, and Celanese knew this when it hired him. In 1997, Garcia had surgery on his knee, and his doctor
placed him on permanent restrictions that prohibited him from climbing ladders, squatting, kneeling, and crawling. 
Celanese terminated him after that surgery. After his termination Garcia sued Celanese for disability discrimination under
the TCHRA. The trial court granted summary judgment in favor of Celanese.

We affirmed the summary judgment, holding that Garcia's knee injury did not substantially limit a major life activity, and
was thus, not covered by the TCHRA. We based our holding on the following reasoning:

While loss of a kneecap is a serious impediment, we do not believe it rises to the level of the type of "disability"
contemplated by the anti-discrimination act. Crawling, squatting, climbing ladders and kneeling are not the same type of
"major life activities" as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing,
learning, and working. See Sutton, 119 S.Ct. at 2139 (citing 1 CFR § 457.103).

Even if working in general is the major life activity that Garcia points to as being substantially limited, we do not believe
that his restrictions rise to the level of significantly reducing his ability to work in a class of jobs or a broad range of jobs as
compared to the average person having comparable training, skills and abilities. When the activity is "working," the
individual's impairment substantially limits the activity when the impairment severely restricts or forecloses his ability to
work in general. 29 C.F.R. § 1630.2(j)(3)(i); Redmon, 745 S.W.2d at 318;Azubuike, 970 S.W.2d at 63-64; Chandler v. City
of Dallas, 2 F.3d 1385, 1391-93 (5th Cir. 1993), cert. denied, 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994). In
other words, it is not enough that the employee asserting a disability cannot perform a single or particular job or a narrow
range of jobs. Azubuike, 970 S.W.2d at 63-64. As the Supreme Court pointed out in Sutton, [C]reating physical criteria for
a job, without more, does not violate the ADA. The ADA allows employers to prefer some physical attributes over others,
so long as those attributes do not rise to the level of substantially limiting impairments. An employer is free to decide that
physical characteristics or medical conditions that are not impairments are preferable to others, just as it is free to decide
that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job. Sutton,
119 S.Ct at 2142-43.

Garcia, 28 S.W.3d at 599-600 (emphasis added).

We believe the reasoning in Garcia applies to this case. We do not find that Mayfield's flat-footedness is the type of
disability the TCHRA was intended to address. The inability to perform frequent stair climbing or climbing of ladders and
scaffolds does not significantly restrict Mayfield in his ability to perform either a class of jobs or a broad range of jobs in
various classes as compared to the average person having comparable training, skills, and abilities. See Sutton, 119 S.Ct. at
2142. Mayfield's flat-footedness does not severely restrict or foreclose his ability to work in general. Dr. Hansen based his
analysis on no stair climbing rather than no frequent stair climbing. He did not know if other employers would agree with
Carbide's restrictions, and he did not interview other employers to determine how they would treat Mayfield's
flat-footedness. He also did not take into account that Mayfield had received a commercial driver's license and that he had
worked as a truck driver after Carbide terminated him. Dr. Hansen's analysis did not show that Mayfield could not work in
general. See Sutton v. United Airlines, Inc., 527 U.S. 471 (1999). (8) 

Further Mayfield testified that he held jobs as a safety coordinator, a paramedic, and a truck driver. He is not prevented
from holding positions similar to those because of his foot condition. He also testified that he declined to accept a job as a
safety clerk at Union Carbide because of the inferior pay scale. This is indirect proof that his foot condition does not render
him incapable of performing this type of position as well. The mere fact that Mayfield is no longer qualified to perform a
job with superior pay does not create a right of action under the TCHRA.

Moreover, frequent stair climbing and climbing of ladders and scaffolds are not the kind of major life activities that were
envisioned by the Act. Certainly, Mayfield's foot condition is not serious enough to affect his use of public facilities and
common carriers, his ability to obtain housing, or his ability to cross the street. See Redmon, 745 S.W.2d at 318. While
true that Mayfield is restricted in the range of jobs he can perform by his unfortunate physical limitations, he is not
impaired to the point that he "might not be able to participate in the social or economic life of the state, achieve
independence, or become gainfully employed," without the protection of the TCHRA. See id. We believe this is the type of
"minor physical or mental defect" that falls outside the scope of the Act. See Garcia, 28 S.W.3d at 599-600; see also Deas
v. River West, L.P., 152 F.3d 471, 481-82 (5th Cir. 1998) (hospital employee's termination due to two minor seizures and
employer's unwillingness to employ her anywhere in the hospital held not sufficient to cover a broad class of jobs). We
sustain the first issue.

3. "Disability" Under the Other Two Statutory Definitions

By issue two Carbide assets that the trial court erred in failing to find as a matter of law that it did not maintain a "record
of" disability with regard to Mayfield. By issue three Carbide asserts that there was no evidence, or alternatively
insufficient evidence, to support the jury's finding that Mayfield was "regarded as" disabled, or had a "record of" disability. 
Question two asked the jury, "Was Delfa Mayfield removed from his operator position because Union Carbide
misclassified or maintained a record of an impairment that substantially limited him in the major life activity of working? 
The jury answered affirmatively

A. Record of Impairment

To prevail on a "record of disability" claim a plaintiff must show that he "has a history of, or has been misclassified as
having, a mental or physical impairment that substantially limits one or more major life activities." See Deppe v. United
Airlines, 217 F.3d 1262, 1267 (9th Cir. 2000). In order to constitute a disability under the TCHRA the impairment must be
"a mental or physical impairment that substantially limits at least one major life activity" of the individual. See Tex. Lab.
Code Ann. § 21.002(6) (Vernon Supp. 2001). Because we have already held that as a matter of law Mayfield's foot
condition does not amount to such an impairment, regardless of whether he contends that he had a record of having the
impairment, this impairment does not amount to a disability as defined in the Act. See Garcia, 28 S.W.3d at 599-600. The
evidence does not establish that Mayfield has a record of an impairment that substantially limited him from working in a
broad class of jobs or a broad range of jobs.

B. Regarded as Having an Impairment


An employee is regarded as having a substantially limiting impairment if his employer mistakenly believes that (1) he has a
physical impairment that substantially limits one or more major life activities, or (2) an actual, non-limiting impairment
substantially limits one or more major life activities. See Sutton, 119 S.Ct. at 2149-50. In both instances a covered entity
must entertain misperceptions about the individual--it must believe either that one has a substantially limiting impairment
that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. 
Id. at 2150.

Mayfield attempts to prove that Carbide regarded him as disabled through its refusal to approve him for working as an
operator due to his foot condition. In Deas v. River West, L.P., 152 F.3d 471 (5th Cir. 1998) plaintiff, a hospital technician
with epilepsy, had two minor seizures at work. Her employer fired her due to her seizures and told her there were no jobs
for her in the entire hospital. She sued, alleging her employer regarded her as having an impairment because the employer's
assertion there were no other jobs she could work in at the hospital proved they perceived her to be substantially limited in
her ability to work in any clinic or hospital setting, including work as a housekeeper, secretary, groundskeeper, and a
diverse assortment of other jobs. Id. at 480-81. The Fifth Circuit disagreed, holding that the evidence presented did not
warrant the inference her employer regarded her as being unable to work in a broad class of jobs. Id. at 481. Rather the
evidence merely showed that her employer regarded her as unable to work in any but a few highly specialized jobs that
required relatively high levels of vigilance or uninterrupted awareness. Id. at 481- 82.

Here while Carbide's restrictions show that it perceived Mayfield as being unable to work at jobs requiring ladder climbing
or frequent stair climbing because of his foot condition we do not view Carbide's restrictions as indicative that it perceived
Mayfield as being unable to work to such an extent that would substantially limit a major life activity. We cannot conclude
that Carbide regarded Mayfield as being unable to work in a broad class of jobs or a broad range of jobs in various classes. 
There is undisputed evidence which shows that Carbide attempted to place Mayfield in a safety clerk's job for which it did
not deem him disqualified due to his foot condition. This evidence shows that Carbide believed Mayfield to be qualified for
other positions. See Sherrod v. American Airlines, Inc., 132 F.3d 1112, 1122 (5th Cir. 1998). Further Dr. Hansen's
testimony showed that even with a restriction of no ladder climbing and no stair climbing Mayfield could still do thirty
percent of the jobs at the Seadrift plant. Thus we hold that Carbide did not regard Mayfield as disabled. We sustain issues
two and three.

Due to our disposition of the above issues we need not address Carbide's remaining issues. See Tex. R. App. P. 47.1.

We REVERSE the trial court's judgment and RENDER that Delfa Mayfield take nothing by his suit against Union Carbide
Corporation.

______________________________

J. BONNER DORSEY,

Justice



Publish .

Tex. R. App. P. 47.3(b).

Opinion delivered and filed

this 31st day of August, 2001. 

1. Senior Justice Robert J. Seerden assigned to this court by the Chief Justice of the Supreme Court of Texas pursuant to
Tex. Gov't Code Ann. § 74.003 (Vernon 1998).

2. See Tex. Labor Code Ann. § 21.001-.556 (Vernon 1996 & Supp. 2001).

3. This letter was kept in Mayfield's medical file at Carbide.

4. Dr. Cranston explained that when a person is in an emergency response position, EMT, or fire fighter, the person has to
get an annual physical to see if the person qualifies to stay in as an EMT or a fire fighter.

5. Dr. Cranston had access to Mayfield's medical records from the time that Mayfield worked for Carbide as a rigger.

6. Dr. Hansen stated that the Golden Crescent area is heavily oriented toward the chemical, aluminum, and plastic
industries. He said that "[w]hen you start to eliminate stair climbing and ladder climbing, you have reduced the
opportunities to basically sedentary jobs; meaning that somebody needs to be in a job where they don't move much. They
just sit at a desk or do something like that. . . . If you take stairs and ladders away, you've eliminated a good portion of his
ability to earn an income."

7. Dr. Cranston testified that this "no stair or ladder climbing" restriction was a clerical error.

8. In Sutton, the Court stated "It is not enough to say that if the physical criteria of a single employer were imputed to all
similar employers one would be regarded as substantially limited in the major life activity of working only as a result of
this imputation. An otherwise valid job requirement, such as a height requirement, does not become invalid simply because
it would limit a person's employment opportunities in a substantial way if it were adopted by a substantial number of
employers." Id. at 493-94.