NUMBER 13-00-180-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI-EDINBURG

 


HOFFMANN-LA ROCHE, INC. A/K/A ROCHE AND JIM WEBBER, Appellants,


v.


JOAN ZELTWANGER A/K/A JOAN GONZALEZ , Appellee.

 


On appeal from the 192nd District Court

of Dallas County, Texas.

 
O P I N I O N


Before Justices Dorsey, Rodriguez and Hill (1)

Opinion by Justice John G. Hill


Hoffmann-La Roche, Inc. and Jim Webber appeal from a judgment in favor of Joan Zeltwanger based upon a jury verdict. 
The judgment awarded damages to Zeltwanger on her claims of sexual harassment and intentional infliction of emotional
distress against both of the appellees. In her claim against Hoffmann-La Roche for sexual harassment, the trial court
awarded her $347,036 for back pay, $500,000 in front pay, plus prejudgment interest. In her claim against Hoffmann-La
Roche for intentional infliction of emotional distress, the trial court awarded her $1,000,000 for mental anguish, $23,000
for past medical expenses, plus prejudgment interest on both. Additionally, the trial court awarded $50,000 for future
medical expenses and $8,000,000 exemplary damages with respect to this claim. In Zeltwanger's claim against Webber for
intentional infliction of emotional distress, the trial court awarded judgment in the amount of $30,000 for mental anguish,
plus prejudgment interest, and $7500 exemplary damages. The trial court entered a judgment that Zeltwanger take nothing
as to her claim against Hoffmann-La Roche for retaliatory discharge. The trial court also entered a take-nothing judgment
as to all claims brought by Webber and Hoffmann-La Roche. 

Hoffmann-La Roche presents four issues:

(1) Zeltwanger's claim of intentional infliction of emotional distress should not have been submitted to the jury because: (a) 
it is not liable for Webber's personal misconduct under theory of vicarious liability or vice-principal; (b) it terminated
Webber promptly after investigating Zeltwanger's complaint; (c) it took no action to approve, condone, or ratify Webber's
misconduct; (d) it did not engage in any independent tortious acts; and (e) neither Webber's acts nor any acts by Roche
meet the standard of outrageous conduct as a matter of law and there was insufficient evidence to prove that Webber or
Roche acted with malice.

(2) the actual and exemplary damages awarded against Roche for intentional infliction of emotional distress are not based
upon sufficient evidence because: (a) the jury found that Zeltwanger's actual damages amounted to $30,000 based upon
Webber's actions, while finding $1,000,000 in actual damages against Roche for the same injuries inflicted by Webber; (b)
there is no basis to award exemplary damages against Roche because it did not engage in any independent acts. Webber's
malice, if any, cannot be imputed to Roche and, in the absence of a finding that Webber acted as a vice-principal,
exemplary damages cannot be awarded against Roche for Webber's independent misconduct; (c) there is insufficient
evidence to support the disproportionate award of actual and exemplary damages against Roche; and (d) there is no
evidence or factually insufficient evidence to support the award of factual and exemplary damages against Roche.

(3) The trial court erred in submitting Zeltwanger's claim of sexual harassment because: (a) virtually all of her allegations
of sexual harassment fell outside the statute of limitations under the Texas Commission on Human Rights Act; (b) conduct
falling outside the statute of limitations are not actionable; (c) the only incident even arguably within the limitations period
was not "severe or pervasive" and cannot support a finding of a sexually hostile environment; and (d) the district court's
refusal to submit Roche's issue on the statute of limitations to the jury requires reversal of any damages awarded.

(4) As to the claim for sexual harassment, (a) it was improper for the district court to award front pay, and (b) the district
court erred in calculating interest on back pay.

Webber presents three issues on appeal:

1. Zeltwanger's claim of intentional infliction of emotional distress should not have been submitted to the jury because
Webber's acts do not meet the standard of "extreme and outrageous" conduct as a matter of law.

2. The exemplary damages awarded against Webber are based upon no or insufficient evidence to support a finding that he
acted maliciously.

3. The judgment against Webber should be reversed because the findings of the jury are against the great weight and
preponderance of the evidence. Webber makes no argument on his own, choosing to adopt the arguments presented by
Roche. We affirm.

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

An underlying basis for Hoffmann-La Roche's first issue and Webber's first issue is that there is no evidence to support
Zeltwanger's claim for intentional infliction of emotional distress as to either Hoffmann-La Roche or Webber, respectively. 
In determining whether there is no evidence of probative force to support a jury's finding, we must consider all of the
evidence in the record in the light most favorable to the party in whose favor the verdict has been rendered, and we must
apply every reasonable inference that could be made from the evidence in that party's favor. See Merrell Dow
Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997). In this review, we disregard all evidence and
inferences to the contrary. See Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995); Best v. Ryan Auto
Group, Inc., 786 S.W.2d 670, 671 (Tex. 1990). We will sustain a no-evidence point of error when: (1) there is a complete
absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only
evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of
evidence; or (4) the evidence conclusively establishes the opposite of the vital fact. See Havner, 953 S.W.2d at 711. More
than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions. Id.; Burroughs Wellcome Co. 907 S.W.2d at 499.

Joan Zeltwanger, now Joan Zeltwanger Gonzalez, testified that she was hired by Hoffmann- La Roche, Inc., a
pharmaceutical company, in November 1990, as a sales representative. In order to prevent any confusion caused by her
change of names, we will refer to her throughout this opinion as Joan. Joan said that initially her sales manager was Betty
Turicchi, with whom she enjoyed working. According to Joan, Turicchi gave her a very good job rating. Joan stated that in
1992, due to realignment, Webber became her sales manager.

Joan related that she started having problems with Webber within the first three or four months of the change, with Webber
telling a lot of jokes, making sexual connotations, and not really listening to her. She said that Turicchi was not surprised
when she told her the type of behavior he was exhibiting. Joan indicated that Turicchi told her that was how Webber was,
that was his personality, and that was how he conducted his business in the work group. Joan related that Turicchi gave her
pointers as to how to deal with it, but did not tell her about any complaint procedures nor urge her to take any other action. 
In fact, according to Joan, Turicchi told her that she would not want that in her file in the company headquarters, because
once she complained it would be difficult to get any kind of promotion or anything else within the company. 

Joan stated that she talked to Turicchi again in 1993 before filing her complaint with Roche. She said that Turicchi gave
her pointers on how to handle and document everything that was happening. Joan filed a sexual harassment complaint with
Roche in August 1994. She testified that Webber: (1) continually told dirty jokes; (2) he talked about topless dancers; (3)
with thirty people present at a division meeting, he danced up to her with $5 in his teeth and knelt down in front of her and
delivered it that way; (4) he talked about the girls he "screwed" in college and how his car was called the "Snatchmobile;"
(5) while standing at the trunk of her car, he told about the couples he and his wife still knew and how his goal was to do
them all; (6) while on a field trip the previous winter, he made inappropriate references to his "ding-dong" and how he had
whipped it out when he was at school; (7) about every time he rode with her he went into explicit details about sexual
encounters, and, when she asked him not to, he kept on talking and laughed it off; (8) while he was at her home checking
on samples, she caught him going through her underwear. 

Joan related that after she filed her complaint, she was scheduled for a performance review that was scheduled at Webber's
home, since Roche did not maintain regional offices. She indicated that she requested that it be postponed or not held at
Webber's home. She relates that at her request Betty Turicchi appeared as an observer at the review.

Joan stated that, from the beginning of the review, Webber was screaming and yelling at her. She said that he had pages
and pages of false accusations against her in her territory and that he ripped apart everything she had done in the territory
and that she had done as a person. She indicated that whenever she tried to respond with her data he would come back
screaming and yelling at her. She testified that she left the review crying after Webber gave her an "H" rating, which at
Roche was an unacceptable rating. 

Joan said that she went to a psychiatrist the evening of the review, at the recommendation of her therapist. She stated that
she had become stressed and very sick from all the stress and things that were happening, such as the continual harassment
from Webber. Joan indicated that, after her psychiatrist recommended that she take a short leave of absence and try to
heal, she enrolled in Roche's short-term disability program.

Joan testified that she was notified in September that Roche, following an investigation, had fired Webber. Joan indicated
she was notified a month later that, based upon the "H" review that Webber had given her, she was terminated. She stated
that her worst fear about making a complaint was that she would be fired. She related that the unfairness of being fired
based on the "H" review she received from Webber entered into the distress it was causing. She said that, as a result, she
became severely depressed, had a lot of insomnia, and had nightmares. She indicated that there were rumors that Webber
was going to come after her because she had filed a complaint. According to Joan, her psychiatrist reported that she was
suffering from depression resulting from extreme stress from sexual harassment in the work place and loss of job, that she
felt hopeless, had low energy, reduced concentration, insomnia and other symptoms of depression. Joan acknowledged that
Webber never asked her out on a date. She also indicated that in the summer of 1994 she knew that a merger was a
possibility. 

Dr. James Grubbs, a physician whom Joan was required to see on behalf of Roche with respect to Joan's claim for
disability, reported that she was unable to perform the material duties of her regular employment, although he did not feel
that she was totally disabled. He said that she could not perform the duties of any occupation other than something
part-time that she could do from home. 

Bob Arment, a regional sales manager, testified that, while he never saw Webber risk offending a female, Webber told him
lewd jokes, some of them offensive. He also acknowledged that Webber used foul language, "occasionally crossing the
boundary." He identified a letter that he received from Webber in late August, 1994, in which Webber requested Joan's
termination based upon her poor selling skills. Arment denied that Joan was fired based on Webber's recommendation. 
Arment indicated that he, John Bigelli, his supervisor, and Steve Saltz, Roche's national sales manager, made the decision
that Webber's 1994 evaluation would stand despite her claim of sexual harassment against Webber that was pending at the
time he made that evaluation. Arment acknowledged that the division manager is who Roche was for the sales
representative out in the field.

William Naro testified that prior to being the business unit director for Roche he was the director of human services. He
stated that Roche's policy manual was only distributed to supervisory personnel and would not have been distributed to
Joan. He quoted that policy as being that supervisors are to report and investigate all claims of sexual harassment. He
indicated that it also stated that the supervisor's response represents that of the company. He insisted, however, that there
was access to Roche other than through its managers. He acknowledged that Turicchi did not follow Roche policy when
she did nothing in response to her conversations with Joan. 

Naro testified concerning a reduction in force that occurred in connection with Roche acquiring a company called Syntex. 
He told of Roche using a company called ZS for the purpose of making a blind determination as to whom would be
terminated, although he acknowledged a fax from ZS to him that included not only an identification number for the
employees but the name of the employees as well. He indicated that he understood that Webber's reviews of Joan were
going to be used in the reduction in force project and that he never voiced an opinion that was unfair in view of her sexual
harassment complaint. He acknowledged that Roche could have gone back and considered whether any of Webber's
reviews were tainted, but neither he nor Roche ever did so. He insisted, however, that he never did so for anyone else. 
Naro also acknowledged that as the reduction process went along it became less blind and more subjective. He admitted
that he never looked at Joan's sales to see if she was being treated fairly. Naro later testified that management accepted the
year-end merit reviews as valid, including Webber's, and that they adopted his actions with regard to the performance
reviews in making the decision to terminate Joan. 

Betty Turicchi testified that during the time she managed Joan her performance was very good and she was impressed with
what Joan was doing. She told of a joint meeting between her group and Webber's that occurred after Joan had moved to
Webber's group in which Webber, after Joan had answered a question correctly, rolled up a $5 bill and put it in his teeth,
shimmied over to Joan and she had to take the money from his mouth. She indicated that Webber had said something like,
"I thought you didn't go to those kinds of places." She also related an incident related to her about Sheila Sutherland
considering calling 911 in order to get him out of her room after he had made a pass at her. She acknowledged that Roche
had conducted a one-day seminar for managers about what sexual harassment was and how not to do it. She told of Joan
telling her of her complaints about Webber, but noted that she did not pass the information along to anyone else. 

With respect to the review she attended, she indicated that Webber ran over Joan during the review. She said he was heavy
handed and his tone was overriding and dominant. She indicated that he would not discuss any information Joan put
forward. She acknowledged there was no sexual gesture or touching. She said she was instructed that she was only to be
there physically so that is all she did. She admitted that she did not make a contemporaneous report about the $5 bill
incident because that was not consistent with the Roche culture. She indicated that she would have felt badly about herself
had she done so. 

Mike Malecki was director of equal opportunity and executive resources of Roche, reporting to the vice president of human
resources. He indicated that Roche conducted an investigation of Joan's complaints and that he would rely on the accuracy
of Betty De Vos's notes that she made in the process of that investigation. He acknowledged that an employee would be
concerned as to how the filing of a complaint might affect their job, their employment, and their future opportunity. He
mentioned that people on occasion are concerned about their performance rating and whether they would be supported by
the company if they were to file such a complaint. He indicated that Roche would not tolerate retaliation for making a
complaint. He said he could understand that getting a performance review from the very person one is complaining about
would be a valid concern for Joan. He acknowledged that it would not have been proper if Bob Arment knew Joan had
made a complaint but did nothing to ensure that she was not retaliated against. 

Malecki testified that Webber was terminated by Roche because it was felt that he had engaged in inappropriate behavior
and comments toward Joan and others. He indicated that Turicchi was not disciplined for failing to bring forward Joan's
complaint sooner. 

Malecki indicated that Roche issues a policies and procedures manual containing equal opportunity policies, including
those involving sexual harassment. He acknowledged that they were intended as guidance for managers and supervisors
and that sales representatives were only told where and how they could access them. He stated that each supervisor would
have one and it would be in the library in Nultey, New Jersey, the site of Roche's headquarters. He acknowledged that in
his deposition he had testified that Roche provided no classroom training to sales representatives about how to make a
complaint if the need should arise. Malecki also testified concerning the notes made by De Vos during her investigation of
Webber.

Jim Webber testified that he recalled saying to Turicchi and John Nathan, after a training session, that "No one objects to
the pat, it's the squeeze and the hold that they object to." He testified that in a 1994 meeting with people above him in
management, such as Steve Saltz, Jon Bigelli, and Bob Arment, he learned that there was to be a reduction in force due to
the Syntex-Roche merger. He indicated that he was told that he had to give someone in his work group an "H" rating,
whether they deserved it or not. He said that his initial intention was to give Joan the "H," but he changed to another
employee at the insistence of Arment. He did so, and that employee told him that she would "not take this sitting down." 
Webber said that he subsequently went back to his original decision to give it to Joan, despite the direction from his
supervisor that he give it to someone else. 

Webber testified that he could not remember the incident involving the $5 bill, but acknowledged that if he did it would be
very demeaning to another professional. He said that other sales representatives at the meeting could not remember his
doing it. He accused Turicchi of lying about it. He denied Joan's accusation that he asked her in front of doctors if she
were wearing panties. He indicated that, when he found out that Joan had requested that another manager be present at her
review, he suspected that she had made some kind of complaint against him, but that he did not know the full extent of it. 
He denied being more aggressive in the review. He denied sexually harassing either Joan or Sheila Sutherland, although he
acknowledged that at one time he and Sutherland had shared a mutual kiss. He denied being mean or abusing Sutherland in
her job because she had rejected him sexually. He acknowledged telling dirty and racial jokes in select company, although
he also told of counseling others about telling racial jokes. Webber asserted that the use of jokes in the workplace was part
of the Roche culture and that the jokes got somewhat vulgar. He recalled that Zinner, Bigelli, and Saltz told jokes that were
not in good taste, jokes he characterized as being in the same category as those Joan attributed to him. Webber recounted
one vulgar joke told by Saltz, the national sales manager for Roche. He said that August 1994 was the only time anyone
ever talked to him about his joke telling. He said that when Arment talked to him about it he made a reference about how
the fact that they talked about it needed to be on the record. He indicated that Arment himself told dirty jokes in small
groups, that he was just going through the motions. He said that immediately after the admonishment, John Bigelli, the
area sales director, pulled him into his office to tell him a joke. 

Webber testified that he promoted Joan in April 1994 because she had been asking him for it and he had seen some
improvement since the last time he had been out in the field with her. He acknowledged that he had become too close with
Sutherland, but said he had not had any physical contact with her other than one kiss. He said that she was very afraid when
De Vos contacted her and that she told De Vos a number of lies. As an example, he indicated that he did not keep pursuing
her until she got married and did not get mean because she told him he had no chance with her. He related that
representations by Larry Walker to De Vos that he was disrespectful to women or that he treated them like pieces of meat
was a lie. He acknowledged that Joan was destroyed by his review, but he blamed it on Roche, saying that Roche had done
it through him. 

Sharon Lupinsky, a sales representative for Roche, said that everyone enjoyed themselves at group sales meetings. She said
that Webber and the other guys told jokes and that Webber was not offensive to her. She said the jokes were Aggie or
Polish jokes, not sexually harassing jokes. She said Webber would comment on women being good looking. 

Lupinsky told of a manager whom she felt did not approve of her working because she was married and had children. 
Once, in a fax, she had said that she felt weakened, unempowered, depressed, and scared because she was harassed,
screamed at, and threatened. In response to complaints about the manager, she was told that what he was doing was poor
behavior but did not violate company policy. The remedy suggested was that she spend more time with the manager. 
Although she testified that was a good idea, she indicated that she had previously written that it was punitive and grossly in
favor of the manager, saying it was like dating your rapist. She indicated, however, that when she asked to be removed
from the manager she was. 

Dr. Michael Higgins testified that Roche, in its sexual harassment training, pointed out that management has a unique
responsibility because of its power. He indicated that a sexual harassment complaint, as opposed to other types of
complaints, called for a quick response on the part of the supervisor. He said that person was expected to listen and take
down the facts, then forward that information quickly up the line. He had no opinion with respect to whether Joan had
done all she was required to do to bring forward a complaint to Turicchi because he did not know what she said. He said
that while the manager is not Roche, the manager acts in agency on Roche's behalf. With respect to Joan being forced to go
into Webber's home after making her complaint, he blamed the manager for putting himself in that position. He said the
managers hired the sales representatives, decided who got a raise, with input from human resources, and determined how
the bonus pool was split up. He indicated that it was both managers and human resources who fired employees, with the
emphasis on human resources. 

Sheila Sutherland testified that at national sales meetings Webber told a wide range of jokes, some of which were dirty
jokes. She said some he would tell to large groups, others within his division. She said he also told jokes during regional
meetings. She indicated that he was flirtatious with her and seemed to have a crush on her. She stated that she did not see
the same sort of attraction or fondness with respect to the other sales representatives. She related that sometimes his
attraction resulted in conduct with which she was not comfortable, that he wanted some type of relationship with her. She
acknowledged that she was not really sure what he wanted, that he did not want a full relationship with her. According to
Sutherland, when she confronted Webber and told him that she did not want any relationship, it put him off for a while. 
She affirmed that she had never reported any of this to Roche because she felt that she could handle it. 

Sutherland testified that had she felt it necessary to make a complaint she knew that she was supposed to do it through
human resources. She said she felt Webber's actions toward her probably constituted sexual harassment. She indicated that
when Webber tried to kiss her she turned her head and told him not to do it. She denied ever being in a situation where she
thought about calling 911. She told De Vos that when she confronted Webber about why he was treating her differently
after she got married, he said that the only reason was that he had no chance with her. She said that Webber's jokes were in
bad taste, but they did not offend her.

Ellen Coury, an employee of ZS Associates, testified that Roche employed ZS to assist in its reduction in force plan. She
said that the process of selecting employees for termination was blind as to them because they did not know any of the
individuals, but that both they and Roche had the names of the individual employees during the process. She indicated that
performance ratings, rather than sales data, were utilized in making the decisions. 

To recover damages for intentional infliction of emotional distress, a plaintiff must prove that: (1) the defendant acted
intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff
emotional distress; and (4) the resulting emotional distress was severe. GTE Southwest, Inc. v. Bruce, 998 S.W.2d 605, 611
(Tex. 1999) 

To be extreme and outrageous, conduct must be "so outrageous in character, and so extreme in degree as to go beyond all
possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. 
Generally, insensitive or even rude behavior does not constitute extreme and outrageous conduct. Id. at 612. Mere insults,
indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous
conduct. Id. 

Texas courts have adopted a strict approach to intentional infliction of emotional distress claims arising in the workplace,
relying on the fact that, to properly manage its business, an employer must be able to supervise, review, criticize, demote,
transfer, and discipline employees. Id. Although many of these acts are necessarily unpleasant for the employee, an
employer must have latitude to exercise these rights in a permissible way, even though emotional distress results. Id. 
Consequently, in Texas, a claim for intentional infliction of emotional distress does not lie for ordinary employment
disputes. Id. The extreme and outrageous conduct required in such a cause of action in the workplace exists only in the
most unusual of circumstances. Id. at 613. 

It is initially for the court to decide whether the defendant's conduct may reasonably be regarded as so extreme and
outrageous as to permit recovery. Id. at 616. When reasonable minds may differ, however, it is for the jury, subject to the
court's control, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to
result in liability. Id. 

We believe that the evidence that we have outlined above would have supported a conclusion by a jury that Roche allowed
the development of a corporate culture that tolerated the telling of vulgar and suggestive jokes in both small and large
group settings, thereby tolerating the continued employment of those who persisted in such conduct; that Joan and others
were sexually harassed by Webber, her manager; that when she informally went to her former manager about the problem
the former manager, contrary to company policy, failed to forward Joan's complaint to a higher level; that when she did file
a complaint, Roche required her to attend a performance review in which she would have had to be at Webber's home by
herself; that as a result Joan had to request the presence of another manager at that review; that Roche required that other
manager to serve only as an observer at the review; that the presence of the other manager caused Webber to suspect that
Joan had filed a complaint against him; that Webber yelled and shouted at Joan during the review, would not allow
discussion of issues raised as to her lack of selling skills, and gave her a performance rating that was sure to result in her
termination during a reduction in force caused by Roche's merger with Syntex, another company; that Webber requested
that Roche terminate Webber; that Roche terminated Webber for sexually harassing Joan and others; that Roche terminated
Joan based upon the "H" rating that Webber gave her in connection with her performance review; and that all of this caused
Joan severe emotional distress.

The Texas Supreme Court has held, in a case involving the possibly wrongful termination of an employee who had filed a
sexual harassment claim, that the mere fact of termination of employment, even if the termination is wrongful, is not legally
sufficient evidence that the employer's conduct was extreme and outrageous. Southwestern Bell Mobile Sys. v. Franco, 971
S.W.2d 52, 54 (Tex. 1998). However, in the case at bar, we hold that the entirety of Appellants' conduct, both individually
and collectively, may reasonably be regarded as so extreme and outrageous as to permit recovery. 

Both Webber and Roche urge that Webber's acts of sexual harassment do not constitute the outrageous conduct required in
order to sustain a claim of intentional infliction of emotional distress. Even if this were so, the acts constituting outrageous
conduct are not limited to sexual harassment on Webber's part, but also include acts of Roche in fostering a corporate
culture that allowed such conduct on Webber's part; Roche's initial failure to respond to Joan's concerns; Roche's
callousness in requiring Joan to appear at a review at Webber's home, thereby allowing him to surmise that she had filed a
complaint when she requested another manager to appear with her; Roche's action in not allowing its observer to prevent
Webber's hostile behavior at the review; and Roche's terminating Joan, after Webber had recommended that she be
terminated, in part based upon the use of the "H" rating Webber gave Joan in connection with her last performance review.

The jury could reasonably have found that Webber and Roche both individually and collectively engaged in this conduct
and that the conduct of each was outrageous. Rather than acknowledging any impropriety on its part and asserting that its
conduct was not outrageous, Roche merely asserts that Webber's conduct was not outrageous. Roche urges that it is not
responsible for Webber's actions of sexual harassment, but it does not address a lack of responsibility for its own actions
which were instrumental in inflicting severe emotional distress upon Joan. 

Roche claims that the actual damages that Joan recovered against it cannot exceed the amount found caused by Webber
because its liability is derivative. Again, Roche's argument is based on its conclusion that Roche itself was not guilty of
any action showing that it intentionally caused Joan emotional distress, a conclusion that we have rejected. 

Roche argues that Joan has attempted to transform a statutory claim of sexual harassment into the common-law tort of
intentional infliction of emotional distress, thereby attempting to circumvent caps for sexual harassment damages and
permitting Joan to by-pass administrative proceedings prescribed for sexual harassment proceedings. Roche's contention is
again predicated on the erroneous assumption that Joan's claim for intentional infliction of emotional distress is solely
based on Webber's actions of sexual harassment and overlooks his and Roche's actions in assuring her termination. 

Roche relies upon the cases of Standard Fruit and Vegetable Co., Inc. v. Johnson, 985 S.W.2d 62, 68 (Tex. 1998); City of
Midland v. O'Bryant, 18 S.W.3d 209, 216 (Tex. 2000); and Garcia v. Allen, 28 S.W.3d 587 (Tex. App.--Corpus Christi
2000, no pet.). In Johnson, the Texas Supreme Court held that a plaintiff could not recover damages for intentional
infliction of emotional distress after witnessing a truck driver drive a tractor-trailer rig into a parade. Standard Fruit and
Vegetable Co., Inc., 985 S.W.2d at 63. The court indicated that intentional infliction of emotional distress is not available
as an independent cause of action unless the actor intends to cause severe emotional distress or severe emotional distress is
the primary risk created by the actor's reckless conduct. Id. The court sustained a summary judgment for the defendant
because there was no allegation that the truck driver intended to cause the accident and because the primary risk of reckless
driving is physical injury rather than emotional distress. Id. The court did say, as noted by appellants, that intentional
infliction of emotional distress is a "gap-filler" tort that should not be extended to circumvent the limitations placed on the
recovery of mental anguish damages under more established tort doctrines. Id. at 68. In the case at bar, the primary risk of
Webber and Roche's conduct was severe emotional distress. There is nothing in Standard Fruit and Vegetable Co.
indicating that the tort is not available where the primary risk of Appellants' conduct was severe emotional distress 

In City of Midland v. O'Bryant, the court, while holding that the City's decision to reclassify positions formerly held by
police officers as civilian employees does not rise to the level of extreme and outrageous conduct, held that there was no
duty of good faith and fair dealing in the employment context. City of Midland, 18 S.W.3d at 216. In the case at bar,
Joan's recovery for intentional infliction of emotional distress is not dependent upon a duty of good faith and fair dealing. 

This court's opinion in Garcia does not involve a claim for intentional infliction of emotional distress. Garcia, 28 S.W.3d
587. Consequently, there is nothing in that opinion that would indicate that Joan's claim for intentional infliction of
emotional distress is inappropriate or that appellants' conduct was not extreme or outrageous.

Appellants rely upon a large number of cases, outlined in appendix 12 of Roche's brief. We have examined these cases and
found that some involve rude and hostile behavior, while some involve sexual harassment. In those where there is
indication that the plaintiff was terminated, none involved sexual harassment. The closest case that we have found that
would arguably support appellants' position isSouthwestern Bell Mobile Sys., Inc. v. Franco, 971 S.W.2d 52 (Tex. 1998). 
In that case, the plaintiff was wrongfully terminated after making a sexual harassment complaint. Id. at 54. The Texas
Supreme Court held that the mere fact of that termination is insufficient to constitute outrageous conduct. Id. We find that
case to be distinguishable because in this case the behavior of appellants, both individually and collectively, as previously
outlined, went beyond the mere fact of termination. Again, we hold that reasonable minds might differ as to whether such
conduct was outrageous. We overrule Roche's contentions in issue one and Webber's contentions in issue one. 

MENTAL ANGUISH

Roche argues in issue two that its liability for any emotional distress should be limited to the $30,000 which the jury
assessed as the damages awarded Joan as a result of Webber's conduct. This argument is based upon Roche's mistaken
assumption that it did not, by itself, act outrageously. We disagree, as previously noted. 

MALICE

Appellants argue, with respect to Roche's issue two and Webber's issues two and three, that there is no evidence to support
the jury's finding of malice on their part. The trial court instructed the jury that "Malice" means:

(a) a specific intent by Defendants to cause substantial injury to Joan Zeltwanger Gonzales; or (b) an act or omission: (I)
which, when viewed objectively from the standpoint of Defendants at the time of its occurrence, involved an extreme
degree of risk, considering the probability and magnitude of the potential harm to others; and (II) of which Defendants had
actual subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights,
safety or welfare of others. 



We hold that appellants' conduct, as we have previously outlined it, constitutes sufficient evidence to support the jury's
finding of malice. Appellants contend that there is no evidence that Webber was guilty of malice because there is no
evidence that he intended to harm Joan by his sexual harassment and there is no evidence that he had subjective awareness
of the risk involved. The conduct involved here is not solely the numerous acts involving sexual harassment to which
appellants refer. We believe that, at the least, the jury could infer that Webber would have subjective awareness of the risk
involved when all of his conduct, rather than the limited evidence suggested by appellants, is considered.

Appellants contend that the evidence is factually insufficient to support the jury's finding of malice as to Webber. When
reviewing a jury verdict to determine the factual sufficiency of the evidence, we must consider and weigh all the evidence
and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). Having reviewed all of the evidence, we do not find the
jury's verdict finding malice on the part of Webber to be so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust. 

Appellants urge that there is no evidence that Roche acted with malice and that there is no legal basis for imputing
Webber's malice to it. This argument again ignores Roche's own actions that we have previously outlined. We hold that
Roche's actions by themselves support the jury's finding of malice. Roche contends it could not have had malice because it
terminated Webber and discouraged sexual harassment, but such actions on its part are not necessarily inconsistent with the
conclusion that, with respect to its other conduct as we have related, it acted with malice. 

EXEMPLARY DAMAGES

Appellants urge that the jury's award of exemplary damages is excessive. We are to make a factual sufficiency review of
the award, detailing why the evidence either supports or does not support the punitive damages award in light of the factors
outlined in Alamo Nat'l Bank v. Kraus, 616 S.W.2d 908 (Tex. 1981). See Transportation Ins. Co. v. Moriel, 879 S.W.2d
10, 31 (Tex. 1994). 

In Kraus, the Supreme Court held that factors to consider in determining whether an award of exemplary damages is
reasonable include: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of
the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends
a public sense of justice and propriety. 

We have previously detailed at length the nature of the wrong, the character of the conduct involved, and the fact that both
parties had a high degree of culpability in that their actions contributed to Joan's injuries, whether considered independently
or taken together. Other than Roche's act in firing Webber, neither defendant showed much sensibility with respect to
possible damage to Joan as a result of the actions that we have discussed. Such conduct, we believe, greatly offends a
public sense of justice and propriety. We hold that the exemplary damages are not excessive and that there is factually
sufficient evidence to support the damages awarded. While appellants refer us to our need to detail the evidence and
discuss it with respect to these factors, they do not present any argument as to how the application of the factors would
result in a conclusion that the evidence is factually insufficient to support the jury's award of punitive damages. 

Appellants argue that the exemplary damages awarded against Roche are disproportionate to the actual damages awarded,
but their argument is premised on their argument that Roche's damages for mental anguish should have been limited to the
$30,000 damages for mental anguish assessed against Webber. We decline to accept Appellants' argument in view of our
determination that Roche's mental anguish damages should not be so limited. We overrule Roche's issue two and Webber's
issues two and three.

SEXUAL HARASSMENT - STATUTE OF LIMITATIONS 

Roche insists in issue three that the trial court erred by submitting Joan's claim of sexual harassment to the jury because it is
barred by the statute of limitations since most of the conduct in question fell outside the limitations period and was
therefore not actionable and the conduct that did occur within the limitations period was not sufficiently severe or pervasive
to support a finding of a sexually hostile environment. Roche also complains in this issue that the trial court's refusal to
submit its issue on the statute of limitation requires reversal of any damages awarded for sexual harassment. 

Under the Texas Commission on Human Rights Act, it is unlawful for an employer to discriminate against an individual
with respect to compensation or the terms, conditions, or privileges of employment because of race, color, disability,
religion, sex, or national origin. Tex. Lab. Code Ann. § 21.051 (Vernon 1996) (formerly Tex. Rev. Civ. Stat. Ann. art.
5221k, § 5.01(1)); Garcia v. Schwab, 967 S.W.2d 883, 885 (Tex. App.--Corpus Christi 1998, no pet.). The Human Rights
Act is modeled after federal law for the purpose of executing the policies embodied in Title VII of the federal Civil Rights
Act of 1964. See Tex. Labor Code Ann. § 21.001 (Vernon 1996); Garcia, 967 S.W.2d at 885. One form of employment
discrimination is sexual harassment. Garcia, 967 S.W.2d at 885. 

Joan's sexual harassment claim is a hostile work environment form of sexual harassment. Such a claim includes the
following elements: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome sexual
harassment; (3) the harassment complained of was based upon sex; (4) the harassment complained of affected a "term,
condition, or privilege" of employment; and (5) the employer knew or should have known of the harassment and failed to
take remedial action. Id. Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule,
and insult that is sufficiently severe or pervasive to create a discriminatorily hostile or abusive working environment. 
Meritor Sav. Bank FSB v. Vinson, 477 U.S. 57, 64, 67 (1986). Conduct that is not severe enough to create a work
environment that a reasonable person would find hostile or abusive will not trigger Title VII or its Texas equivalent. 
Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Garcia, 967 S.W.2d at 885. Whether an environment is "hostile" or 
"abusive" can be determined only by reviewing all the circumstances, which may include the frequency of the conduct; its
severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably
interferes with an employee's work performance. Harris, 510 U.S. at 23; Garcia, 967 S.W.2d at 885-86. 

Roche does not contend that the evidence is insufficient to support submission of this issue if all Webber's and Roche's
behavior is considered. Rather, it asserts that most of the behavior of which Joan complains occurred prior to the
limitations period and that any behavior that occurred within the limitations period was insufficient to constitute conduct
sufficiently severe or pervasive to create a discriminatorily hostile or abusive working environment. 

A person claiming to be aggrieved by an unlawful employment practice must file a complaint with the Texas Commission
on Human Rights within 180 days of the alleged discriminatory act. See Tex. Lab. Code. Ann. § 21.202(a) (Vernon 1996). 
The parties agree that limitations apply to events prior to July 8, 1994, unless the doctrine of continuing violation is
applicable.

When a charge is timely filed as to one act of discrimination, the doctrine of continuing violation expands the scope of
those discriminatory events that are actionable, as long as one of the events occurs within the 180-day period. Wal-Mart
Stores v. Davis, 979 S.W.2d 30, 31 (Tex. App.-Austin 1998, pet. denied). The doctrine applies when an unlawful
employment practice manifests itself over time, rather than as a series of discrete acts. Id. It is not necessary that the
plaintiff prove that the entire violation occurred within the actionable period so long as the plaintiff can show a series of
related acts, one or more of which falls within the limitations period. Id. As the court states in Davis, "the core idea of the
continuing violation doctrine is that equitable considerations may require that the filing period not begin until acts
supportive of a civil rights action are, or should be, apparent to a reasonably prudent person in the same or a similar
position." Id. The court went on to say that, "The focus is on what event should, in fairness and logic, have alerted the
average layperson to act to protect his or her rights." Id. 

Webber's conduct prior to July 8, 1994, consisted primarily of telling dirty jokes, using vulgar language, and making
various references to his sexual prowess and body parts, even after Joan asked him not to do so. There was also an incident
at a sales meetings where, in a contest in which cash awards were given, Webber gave Joan her money while he was on his
knees with the money in his mouth, as though she were a stripper, and another incident in which Joan found Webber going
through her underwear drawer while he was at her home to check on product samples. 

Webber's conduct within the limitations period included the performance review in which he yelled and screamed at Joan
and gave her a performance rating that a jury could reasonably have determined was in retaliation for her filing a complaint
against him, which he had suspected because Roche had provided another supervisor to be present after it had required that
Joan submit to the review at Webber's home. It also included Roche's action in allowing Webber's performance reviews to
stand, thereby resulting in Joan's termination. 

We hold that Webber and Roche's conduct within the limitations period constitutes conduct sufficiently severe or pervasive 
to create a discriminatorily hostile or abusive working environment. Therefore, the trial court did not err by submitting
Joan's sexual harassment claim to the jury. Because of this holding, we need not determine whether the continuing violation
doctrine would allow the jury to consider any conduct prior to July 8, 1994.

Roche insists that any conduct within the limitations period was not severe and pervasive, suggesting that it was similar to
simple teasing, offhand comments, and non-serious isolated incidents. The conduct by Roche and Webber within the
limitations period is not similar to simple teasing, offhand comments, and non-serious isolated incidents. 

In urging that the conduct was not sufficiently severe, Roche relies upon the case of Mendoza v. Borden, Inc., 195 F.3d
1238, 1246 (11th Cir. 1999) and opinions cited therein. We have examined Mendoza and its reference to the cases that it
cites. While it might be argued that in light of Mendoza and the cited cases that the conduct that occurred prior to July 8,
1994, was not sufficiently severe to support a sexual harassment claim, we note that none of those cases involved conduct
of the nature that occurred after that date, conduct that we have previously described. We conclude that Mendoza and the
cases cited therein are not in conflict with this opinion. When Roche suggests that its action in discharging Webber
prevented harassment from escalating to actionable levels after July 8, 1994, it fails to take into account the actions of itself
and Webber that occurred after that date. 

Roche complains that the trial court erred by failing to submit its limitations defense to the jury. Roche filed with the court
numerous jury instructions and questions. However, there is no showing that Roche made the trial court aware of its
complaint and obtained a ruling. See Munoz v. Berne Group, Inc., 919 S.W.2d 470, 472 (Tex. App.--San Antonio 1996, no
writ). 

In discussing another question, appellants suggest that error was preserved merely by its submitting a question or
instruction that the trial court failed to incorporate into the charge. It relies upon the cases of Matthiessen v. Schafer, 900
S.W.2d 792, 797 (Tex. App.--San Antonio 1995, writ denied) and Morris v. Holt, 714 S.W.2d 311, 312 (Tex. 1986). To
the extent that Matthiessen would hold that merely submitting a requested question or instruction, without any showing
that the trial court was made aware of the request, is sufficient to preserve error, it is inconsistent with Munoz, a later case
from the same court that we have cited above. In Morris, the court held that where one is complaining on appeal of error by
refusing to submit an issue relied upon by the opposing party a written request tendered to and refused by the trial court is
sufficient, despite the absence of an objection, to preserve error. Morris, 714 S.W.2d at 312-13. 

The Texas Supreme Court has held that the test for determining if a party has preserved error in the jury charge is whether
the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. State Dept. of Highways &
Public Transportation v. Payne, 838 S.W.2d 235, 241 (Tex. 1992). Unlike the situation in Morris, in the case at bar there
is nothing in the record to show that the appellants made the trial court aware of their complaint. While in Payne itself we
cannot tell from the opinion what evidence was in the record showing the complaint was brought to the trial court's
attention, we assume that the court would not have held that error was preserved under the test it outlined unless the record
did reflect that the trial court was made aware of the complaint. We overrule the contentions contained in Roche's issue
three. 

SEXUAL HARASSMENT - FRONT PAY

Roche contends in issue four that it was improper for the trial court to award Joan front pay and that the trial court erred in
calculating interest on the back pay awarded. With respect to the front pay issue, Roche argues that the front pay should
have been subject to a statutory cap of $300,000 in accordance with section 21.2585 of the Texas Labor Code. Tex. Lab.
Code Ann. § 21.2585 (Vernon Supp. 2001) because it is a future pecuniary loss. Since briefs were filed in this case, the
United States Supreme Court has determined that front pay is not subject to the damage cap. Pollard v. E. I. Du Pont de
Nemours, & Co., 121 S.Ct. 1946, 1952 (2001). Relying on that opinion, we also conclude that front pay is not subject to
the damage cap. Roche had placed reliance on the Sixth Circuit opinion in Hudson v. Reno, 130 F.3d 1193 (6th Cir. 1997),
cert. denied, 525 U.S. 822 (1998), but, in Pollard, the court held that Hudson was wrongly decided. Pollard, 121 S.Ct. at
1949.

SEXUAL HARASSMENT - BACK PAY, PREJUDGMENT INTEREST 

Roche also insists that the trial court erred in calculating prejudgment interest on back pay by awarding interest on the gross
amount of Joan's back pay rather than on the gross amount less disability payments received by Joan. Roche makes no
argument that the prejudgment interest was improperly calculated with respect to the amount of back pay that was awarded
in the judgment, only that prejudgment interest should have been calculated on a lesser amount suggested by it that takes
into account certain disability payments Joan had received. Roche presents little argument and no authority in support of
its argument. Consequently, we hold that nothing is presented for review. Tex.R. App. P. 38.1(h). We overrule the
contentions presented in Roche's issue four.

The judgment is affirmed.

 

JOHN G. HILL

Retired Justice





Publish.

Tex. R. App. P. 47.3(b).



Opinion delivered and filed

this 10th day of January, 2002.





1. Retired Justice Hill assigned to this court by the Chief Justice of the Supreme Court of Texas pursuant to Tex.
Gov't Code Ann. §74.003 (Vernon 1988).